**Gregory David DUNN**

v.

**PENROD DRILLING COMPANY,
Penrod Drilling Service
Company.**

**CA No. H–84–4153.**

United States District Court,
S.D. Texas
Houston Division.

May 12, 1987.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, Jr., District Judge.

This case was tried to the Court without a jury. At the conclusion of the evidence, the Court rendered a preliminary ruling that the Defendants were liable for the damages sustained by the Plaintiff. Counsel were instructed to submit post-trial briefs in support of their respective positions concerning liability and damages. Plaintiff urged the Court to reconsider an earlier summary judgment ruling that the Plaintiff was neither entitled to Jones Act seaman status nor to the protection afforded by the doctrine of seaworthiness under *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). After careful consideration of these issues, it is the conclusion of the Court that the earlier rulings were correct. Therefore, the Court declines to alter the previous holding as to the Plaintiff's legal status on the date of the casualty.

### Findings of Fact

1. Gregory David Dunn, the Plaintiff, is a thirty-nine year old Australian citizen employed by Weatherford International. (Testimony of Dunn).

2. Penrod Drilling Company and Penrod Drilling Service Company are both named as Defendants. Penrod Drilling Company owned and operated the Penrod 74, a semi-submersible drilling vessel at the time of Plaintiff's injury. No evidence was presented to connect Penrod Drilling Service Company with the operation of the Penrod 74 at the time of Plaintiff's accident. Therefore, liability shall only be adjudged against Penrod Drilling Company (hereinafter "Penrod").

3. At the time of Plaintiff's injury, the Penrod 74 was in the waters off the coast of the Philippines.

4. Employees of Weatherford International were hired to perform casing work aboard the Penrod 74. Phillips Petroleum Company was a mineral lease operator and

Benton Musslewhite, Houston, Tex., Joseph C. Blanks, Reaud, Morgan & Quinn, Beaumont, Tex., for plaintiff.

Edward J. Murphy and Constance Walker, Clann, Bell & Murphy, Houston, Tex., for defendants.

had a drilling contract with Penrod to drill for oil.

5. Weatherford International had a contract with Phillips Petroleum Company to perform casing work for Phillips. No contractual relationship existed between Weatherford and Penrod. Penrod retained control of the vessel throughout the drilling operations.

6. Once aboard the rig, the two Weatherford employees assigned to the Penrod 74 to perform casing operations reported to the Phillips Petroleum representative for instructions. Penrod, however, had complete control over all activity conducted aboard the rig, including safety and maintenance.

7. Plaintiff was a "casing stabber" whose job was to align threads in casing from his position on the stabbing board platform suspended above the drilling floor by a jacknife derrick. (Testimony of Dunn).

8. The stabbing board platform was approximately 15 inches from front to back and forty inches wide. Connected to the front of the platform was a hinged flap that extended the area where the stabber could stand. There was conflicting testimony as to whether a safety chain was attached to the front edge of the flap. According to Dennis Charles Higginbotham, there was a safety chain on the front edge of the flap on the right side when facing the drill floor. (Testimony of Dunn; Testimony of Higginbotham; Plaintiff's Exhibit 20).

9. The stabbing board had an air hoist lift mechanism or winch that the stabber used to raise and lower the platform. There was conflicting testimony as to the location of the winch. The Plaintiff testified that the winch was located on the floor of the platform, making it difficult to safely maneuver on the main portion of the platform. However, Higginbotham testified that the winch was actually in a raised position above the floor. Defendants' Exhibits 1A and 1B, which are photographs taken sometime after the accident, show the winch at a position approximately waist high above the platform floor. (Testimony

of Dunn; Testimony of Higginbotham, Defendants' Exhibits 1A, 1B).

10. When standing on the platform facing the drilling floor, there was a counterweight on the left side to hold the flap in a raised position. If the flap is fully extended, the edge of the dolly carrying the traveling block would hit the flap as the block was being lowered. The purpose of the flap was to enable the stabber to get closer to the particular casing which he was attempting to align with that already in the hole.

11. Two narrow vertical beams welded to the derrick formed the track on which the platform ran. There were manual locks or bars on both sides of the back railing of the platform. In a locked position, the bars were pushed through holes in the vertical beams. (Defendant's Exhibit 1E; Plaintiff's Exhibit 16BB).

12. When facing the drilling floor from the platform there was a safety plate attached to the right side of the platform that the stabber would step onto while waiting for the driller to raise and lower the casing. (Testimony of Higginbotham; Testimony of Dunn).

13. The stabbing procedure required that the casing stabber step onto the flap, lowering it to an extended position. The stabber would then lean forward and maneuver the top of the joint of casing to align it with the casing already in the hole. The casing operator on the floor would then apply the power tongs to the bottom of the joint to thread the casing into casing already in the hole. Power tongs are a hydraulic wrench with a gauge measuring pipe stress attached. The elevators attached to the traveling block would then be lowered over the top of the casing and guided into position by the casing stabber. (Testimony of Dunn).

14. Operations were typically conducted through the use of hand signals. From the driller's console on the floor of the rig, the driller ordinarily raised and lowered the block as necessary after a hand signal from the stabber on the platform. (Testimony of Percle).

15. The stabber then flipped a latch on the elevator, closing the slips inside the elevator around the collar on the joint of casing. Ordinarily, when the slips are securely fastened on the joint of casing, the stabber would give the driller a hand signal signifying that the block could be raised or lowered.

16. While waiting for the next joint of casing, the Plaintiff would step on the safety plate attached to the right side of the stabbing board platform. (Testimony of Dunn).

17. From his position on the drilling floor, the driller could see the upper portion of the stabber's body on the platform. The driller could not see whether the flap was in a raised or lowered position. (Testimony of Percle; Testimony of Godwin).

18. The driller could also hear the sound of the elevators lock around the casing from the drill floor. (Testimony of Percle). The driller could lift the block either after a hand signal from the stabber or after hearing the sound of the elevators latch around the casing.

19. When the stabber stepped out on the flap, the driller could only see the shoulder and hand of the stabber as he reached out to stab the casing. (Testimony of Percle).

20. On October 8, 1981, the Plaintiff arrived aboard the Penrod 74. He was accompanied aboard the rig by another Weatherford employee who functioned as an "operator," using power tongs on the drill floor to screw pieces of casing together.

21. Plaintiff commenced work in the offshore oil industry as a "roughneck with ODNE and ODICO drilling companies prior to his employment with Weatherford. He then worked with Pool Drilling Company as a lead floor hand. He began working for Weatherford International as a trainee between March and April of 1980. (Testimony of Dunn).

22. Subsequent to his training with Weatherford, Plaintiff was promoted to the position of an ST–1. (Testimony of Dunn).

23. Penrod employed Weatherford personnel because they were specialists in running casing on off-shore drilling rigs. (Testimony of Dunn).

24. After coming aboard the Penrod 74 and speaking with the Phillips Petroleum representative, Plaintiff introduced himself to the highest ranking Penrod employee on the rig, the "toolpusher." (Testimony of Dunn).

25. Plaintiff requested permission from the driller and inspected the stabbing board platform. It was the first time Plaintiff had used a stabbing board with a retractable flap, and the Penrod employees aboard the rig were aware that it was Plaintiff's first time on a rig like the Penrod 74. (Testimony of Higginbotham).

26. Plaintiff checked the safety belts on the platform to see if they were securely fastened. The belt enables the stabber to lean out beyond the perforated platform in order to get closer to the casing. (Testimony of Dunn).

27. The traveling block on the Penrod 74 was a slightly oblong metal block with a compensator attached that lifted the casing to the stabber's vicinity as he stood on the platform. (Testimony of Dunn).

28. After the Plaintiff went on the stabbing board, the assistant driller advised him to watch these running rails, referring to large beams located in front of the stabber as he worked. (Testimony of Dunn). The Plaintiff was not informed that a dangerous "pinch point" existed between the lifting rail located on the back of the platform and the brace of the derrick.

29. The Plaintiff was not told that in order to stabilize the platform, the manual locks had to be firmly fastened, nor was the Plaintiff instructed about the appropriate hand signals to use when signalling the driller. Headphones or walkie-talkies which Plaintiff had seen used on other rigs were not provided to enable him to communicate with the driller, nor did any Penrod employee demonstrate to the Plaintiff the proper manner in which to operate the platform. Rather, the Plaintiff was expected to rely on his general experience in the offshore industry to work on a uniquely

constructed stabbing board platform that he had never seen or used before. The Penrod employees expected the Plaintiff to understand that hand signals were to be used by the stabber to communicate with the driller. The only warning typically given a stabber on the Penrod 74 was to "work safe" because of the "close quarters" on the stabbing board platform.

30. The Plaintiff testified that the flap automatically retracted to a "neutral position" due to the movement of the counterweight when he stepped off of it. Although this testimony was contradicted by Higginbotham who stated that the flap had to be lifted manually with an attached chain each time, it is undisputed that the Plaintiff was never instructed that the flap had to be lifted manually and was not guaranteed to retract automatically.

31. The driller and the Penrod toolpusher estimated that from the time the stabber would give a hand signal to the driller signifying that all was clear until the dolly rail for the traveling block could hit the extended flap was not less than twenty seconds. The Plaintiff, however, recalled that it was a much shorter period of several seconds.

32. When Plaintiff's accident occurred, he had already worked on approximately thirty joints of casing without any apparent problems. Plaintiff testified that the flap automatically retracted when he stepped off of it clearing the edge of the dolly carrying the traveling block. He could not recall ever having to lift it manually with a safety chain.

33. At the time of Plaintiff's accident, he was located on the platform approximately forty feet above the drilling floor. (Testimony of Dunn).

34. The Plaintiff testified that it was unfeasible to fasten the manual safety locks from the position where the platform was suspended due to a variance of between four and five feet in the pipe he was working on. He was able to get closer to the pipe by maneuvering the platform without the locks in position. (Testimony of Dunn).

35. It was impossible for the stabber to move the platform up and down with the winch if the manual locks were in place. (Testimony of Godwin).

36. Penrod personnel considered it the responsibility of the stabber to determine whether to move the platform up and down due to a variance in pipe length. (Testimony of Godwin).

37. Stabbers aboard the Penrod 74 were not advised to latch the safety locks every time they stabbed a joint of casing. (Testimony of Godwin).

38. Plaintiff testified that there was no safety chain on the edge of the flap which would enable him to pull up the flap.

39. It was unnecessary for the stabber to remove the belly belt after stabbing the casing. Once the stabber stepped back from the flap, the belt automatically dropped. (Testimony of Higginbotham).

40. Higginbotham believed that the only hazard on the stabbing board platform was the potential for the stabber to injure his hands on the dolly track. (Testimony of Higginbotham).

41. It was customary that the Penrod employees would only go on the platform with the stabber if the stabber had specific questions about the operation of the equipment. (Testimony of Higginbotham).

42. Higginbotham was plainly aware that it would have been more prudent at the start of operations for the Penrod employee to have accompanied the Plaintiff to the stabbing board. (Testimony of Higginbotham).

43. Lee C. Moore Company built and designed the jacknife derrick in Singapore, and shipyard employees installed all of the equipment on the rig, including the stabbing board apparatus. (Testimony of Godwin).

44. The toolpusher had the authority to make minor modifications to the stabbing board platform. Removal of the flap on the stabbing board and an increase in the size of the counterweight or the addition of a spring to enable the flap to automatically retract were considered minor modifications. (Testimony of Godwin).

45. Godwin, the driller, testified that it would have been a "good idea" to warn the stabber about the dangerous pinch point between the angle irons and the rail of the stabbing board platform.

46. Plaintiff's accident was sudden and unexpected. After stabbing approximately thirty joints of casing, Plaintiff felt a sudden jolt as the platform moved abruptly. (Testimony of Dunn).

47. He immediately stepped back placing one foot on the main section of the platform and the other foot on the steel safety plate on the side of the platform. (Testimony of Dunn).

48. The jolt resulted from the metal dolly rail hitting and catching the flap on the stabbing board platform, causing the platform to move downward. (Testimony of Dunn; Testimony of Percle).

49. The flap failed to retract and due to the extension there was no clearance between the dolly rail and the flap.

50. When the dolly rail hit the flap, the driller heard the sound of metal hitting metal. (Testimony of Percle).

51. When the dolly rail hit the flap, the Plaintiff leaned forward and attempted to raise the flap manually in order to free the platform from the dolly rail. (Testimony of Dunn).

52. In order to support himself while attempting to maneuver the flap, the Plaintiff grabbed the rail of the stabbing board behind him with his left hand. (Testimony of Dunn).

53. While the Plaintiff attempted to stabilize the platform, he yelled at the driller to "come off it. I'm hung up." (Testimony of Dunn).

54. The driller then lifted the traveling block and the flap flipped loose. (Testimony of Dunn).

55. The sudden lifting of the dolly rail caused the stress created by the rail to cease abruptly, and the entire platform jerked upwards.

56. At this point, Plaintiff's left hand was trapped between the lifting rail on the back of the platform and a beam or brace attached to the derrick. (Testimony of Dunn).

57. Plaintiff screamed out to the driller, "I've lost my hand." (Testimony of Dunn).

58. The toolpusher, Mr. Godwin, rapidly went up a ladder to the platform to assist Plaintiff. Godwin supported Plaintiff until other Penrod personnel assisted him. (Testimony of Godwin; Testimony of Higginbotham).

59. The Penrod employees lifted Plaintiff from the platform to the floor in a personnel basket attached to a crane. (Testimony of Dunn; Testimony of Godwin).

60. Plaintiff was taken to the medical facility on the rig. A registered nurse supplied by Phillips Petroleum applied a tourniquet to staunch blood and supplied Plaintiff with pain killers. (Testimony of Higginbotham).

61. Plaintiff suffered from extreme pain and experienced great dizziness. He was transported by a helicopter supplied by Phillips Petroleum to Puto Princessa (Port of Pincess) where he received medical treatment. (Testimony of Dunn; Testimony of Higginbotham).

62. After spending the night in a hotel room supplied by Phillips Petroleum and attended by a male nurse, Plaintiff flew to Singapore via Manila. (Testimony of Dunn).

63. In Singapore, Plaintiff was admitted into Mt. Elizabeth Hospital and treated by Dr. Kwanwaljit Soin. (Testimony of Dunn; Deposition of Dr. Soin).

64. Plaintiff underwent four operations including several skin grafts. (Testimony of Dunn; Deposition of Dr. Soin).

65. Surgical procedures for the reconstruction of the Plaintiff's hand required the insertion of pins and Kirschner wires through various points to set bones across Plaintiff's fingers and joints. (Testimony of Dunn; Deposition of Dr. Soin; Plaintiff's Exhibit Nos. 4 and 5).

66. Following surgery, the Plaintiff underwent physiotherapy to enable him to re-acquire the use of his hand. (Testimony of Dunn; Deposition of Dr. Soin).

67. In January of 1986, Plaintiff was examined by Dr. Epstein, a board certified orthopedic surgeon.

68. Dr. Epstein made several observations regarding the Plaintiffs loss of flexibility in his left hand. These observations included:

1. When asked to move his left hand toward the thumb side or radial deviation, he could move it ten degrees and could move it to the little finger side or ulnarally deviated ten degrees. This compared to ten degrees of radial deviation and twenty degrees of ulnar deviation of his right hand.

2. He did not have a complete full spread between thumb and index finger. There was some contracture due to scar limiting his full ability to separate thumb and index finger apart.

(Deposition of Dr. Epstein).

69. Regarding Plaintiff's grip strength, Dr. Epstein observed:

1. In his left hand he could grip to fifteen kilograms. In his right hand he could grip to forty kilograms.

2. The circumferance of his left hand measured twenty centimeters compared to 21.5 centimeters in his right hand.

3. The one and a half centimeter difference indicated some degree of small muscle atrophy in the left hand.

70. Dr. Epstein made several observations regarding disfigurement, noting the presence of scars and skin grafts in the injured area, along the thumb metacarpal, between the second and third metacarpals, through the palm and into the web space of his thumb. (Deposition of Dr. Epstein).

71. Observing x-rays which he had taken, Dr. Epstein detected several healed fractures running across the first, second and third metacarpal bones. (Deposition of Dr. Epstein).

72. Based on his observations, Dr. Epstein was of the opinion that Plaintiff had reached maximum medical recovery, although he still suffers from pain and aching in cold weather, possibly due to pulling on scar tissue in the hand or due to damage to blood vessels. (Deposition of Dr. Epstein).

73. The loss of grip strength and restricted range of motion are permanent conditions although Plaintiff suffers from no permanent nerve damage. (Deposition of Dr. Epstein).

74. Plaintiff suffers from a permanent impairment of function in the left hand of between thirty-seven and fifty percent. (Deposition of Dr. Epstein; Deposition of Dr. Soin).

75. The permanent impairment in Plaintiff's left hand severely restricts Plaintiff's ability to do heavy labor in the offshore drilling industry. It also impairs his ability to perform household tasks and participate in sports and hobbies. Testimony of Dunn; Testimony of Dr. Soin).

76. The evidence presented fails to establish either that the medical care provided to Plaintiff by Penrod was inadequate or that Penrod failed to promptly evacuate Plaintiff from the rig.

77. After the injury, Plaintiff missed five months of work. He received his salary from Weatherford International throughout this period of time with the exception of a $30 per day offshore bonus. The amount of lost bonus for this period of time equals fifteen days for five months or $2,250.00.

78. Plaintiff is still employed by Weatherford International where he has a dual job classification. He works as a computer operator and is capable of using light weight tongs. He is no longer capable of performing stabbing work which involves heavy manual labor.

79. Plaintiff is considered by Weatherford to be a valuable employee and has taken considerable measures to mitigate the damages he has suffered.

80. Without objection, testimony on post accident repairs or revisions was forthcoming. The Penrod employees were aware of the dangerous nature of the stabbing board platform. In 1984, subsequent to Plaintiff's accident, the flap was removed from the stabbing board platform to be repaired. The stabbing board platform

was replaced in the derrick without the flap. Since then, approximately twenty-five casing operations have been successfully conducted without the flap. (Testimony of Godwin; Testimony of Higginbotham).

81. The evidence clearly and competently demonstrates that Penrod Drilling Company was negligent in failing to provide Plaintiff with a reasonably safe place to work, and in failing to exercise reasonable care under the circumstances.

82. Although Plaintiff admittedly had a certain degree of expertise, Penrod failed to afford him a work environment whereby ordinary care was exercised in the performance of casing operations.

83. To begin with, Penrod was negligent in failing to demonstrate how to operate the stabbing board equipment to the Plaintiff who had no prior experience on a stabbing board platform with a flap extension.

84. Penrod was further negligent in failing to advise Plaintiff that the flap had to be manually lifted and was not guaranteed to retract automatically.

85. Penrod was negligent in failing to advise Plaintiff that hand signals were to be used at all times when signalling the driller.

86. Although Plaintiff was experienced as a "casing stabber" and had worked on numerous rigs, the hazards that he encountered on the Penrod 74 were not open and obvious. Penrod employees should have warned him that the safety locks had to be in place at every instant, regardless of the length of pipe Plaintiff was working on.

87. Penrod employees breached a clear duty to provide Plaintiff with a reasonably safe place to work. Ordinary prudence demands that precautions be taken to ensure that those employed in highly dangerous occupations are not subjected to risks beyond those ordinarily encountered by virtue of the hazardous nature of their work. Penrod's failure to meet this standard constitutes negligence.

88. The negligence of Penrod in failing to provide Plaintiff with a reasonably safe place to work proximately caused Plaintiff's injuries.

89. Penrod's negligence in failing to provide adequate warnings to Plaintiff proximately caused his injuries.

90. Penrod has failed to establish by a preponderance of the evidence that Plaintiff's own negligence contributed to his injury. Although testimony regarding the amount of time Plaintiff had to lift the flap varied drastically, no credible evidence was presented to demonstrate that Plaintiff's conduct at the time of the casualty was anything other than a reasonable response to a sudden ultra-hazardous situation.

91. Defendant failed to produce any accident reports or records of medical treatment to demonstrate that Plaintiff's conduct fell short of the standard of reasonableness.

92. Plaintiff has successfully demonstrated by a preponderance of the evidence that Penrod's actions or inactions proximately caused the injuries that he sustained.

*Conclusions of Law*
*General Maritime Negligence*

1. Federal court jurisdiction exists based on admiralty, 28 U.S.C. § 1333 and diversity, 28 U.S.C. § 1332.

2. The legal rights and liabilities arising from an incident aboard a vessel upon the high seas are within the full reach of the admiralty jurisdiction and measurable by the standards of maritime law. *East River S.S. Corp. v. Transamerica Delaval, Inc.*, —— U.S. ——, 106 S.Ct. 2295, 2298, 90 L.Ed.2d 865 (1986); *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 628, 79 S.Ct. 406, 408, 3 L.Ed.2d 550 (1959); *Casaceli v. Martech International, Inc.*, 774 F.2d 1322, 1328 (5th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1516, 89 L.Ed.2d 914 (1986).

3. The traditional test to establish admiralty jurisdiction requires that the locality of the injury be on navigable waters and that the wrong bear a significant relationship to traditional maritime activity. *Executive Jet Aviation, Inc. v. Cleveland*, 409

U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972); *Ali v. Offshore Co.,* 753 F.2d 1327 (5th Cir.1985); *Sperry Rand Corp. v. Radio Corp. of America,* 618 F.2d 319 (5th Cir.1980).

4. In *Kermarec v. Compagnie Generale Transatlantique, supra,* the Supreme Court abandoned the distinctions inherent between the duty owed licensees and invitees in a maritime context. The Court adopted a single duty of "exercising reasonable care under the circumstances of each case" rather than to incorporate in the maritime law the complexities of the common law of invitee and licensee. 358 U.S. at 632, 79 S.Ct. at 410–11, 3 L.Ed.2d at 555; *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 163 n. 10, 101 S.Ct. 1614, 1620 n. 10, 68 L.Ed.2d 1, 10 n. 10 (1981) (defining a vessel's duty to a longshoreman under amendments to the Longshoremen's and Harbor worker's Compensation Act); and *see Smith v. Southern Gulf Marine Co. No. 2, Inc.,* 791 F.2d 416, 422 (5th Cir.1986); *Tittle v. Aldacosta,* 544 F.2d 752 (5th Cir.1977); *McCormick Shipping Corporation v. Stratt,* 322 F.2d 648 (5th Cir.1963).

5. *Scindia,* while instructive, is not dispositive of the case at bar. *Scindia* specifically governs the duty of a vessel owner to a longshoreman under the Longshoremen's and Harbor Worker's Compensation Act ("LHWCA"). While it is clear that Dunn was not a longshoreman, *Scindia* and its progeny establish guidelines governing a vessel owner's obligation to intervene in stevedoring operations that bear similarities to the incident before the Court. Although the *Kermarec* standard has been relied on in reaching the result in this case, the Court's teaching in *Scindia* is worthy of reiteration.

The duty of a vessel owner under *Scindia* is multi-faceted. First, a shipowner has a duty to have the ship and its equipment in such condition that the stevedore may carry on its cargo operations with reasonable safety; and if the shipowner fails at least to warn the stevedore of hidden changes which were known to the shipowner, or should have been known to him in the exercise of reasonable care, he is liable if his negligence causes injury to a longshoreman. Once the stevedore's operations have begun, absent contrary statute, the shipowner has no general duty under § 905(b) of the LHWCA to supervise or inspect and discover dangerous conditions arising within the cargo operations. 451 U.S. at 167, 101 S.Ct. at 1622, 68 L.Ed.2d at 12.

However, circumstances can exist in which the shipowner has a duty to act where a danger to longshoremen arises from the malfunctioning of the ship's gear being used in cargo operations. These circumstances could arise where a longshoreman continued to use defective equipment and the shipowner knew of the defect which presented an unreasonable risk of harm, thereby mandating intervention. *Id.* at 176, 101 S.Ct. at 1626–27, 68 L.Ed.2d at 18. *See also, Theriot v. Bay Drilling Corp.,* 783 F.2d 527 (5th Cir.1986); *Futo v. Lykes Bros. Steamship Co.,* 742 F.2d 209 (5th Cir.1984); *Harris v. Flota Mercante Grancolombiana, S.A.,* 730 F.2d 296, 298–99 (5th Cir.1984); *Stass v. American Commercial Lines, Inc.,* 720 F.2d 879, 882 (5th Cir.1983); *Helaire v. Mobil Oil Co.,* 709 F.2d 1031, 1036 (5th Cir.1983); *Pluyer v. Mitsui O.S.K. Lines, Ltd.,* 664 F.2d 1243, 1247 (5th Cir.1982).

6. Prior to *Scindia,* the *Kermarec* standard was reaffirmed by the Supreme Court in *Marine Terminals v. Burnside Shipping Co.,* 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969), which held that the vessel owes to the stevedore and his longshoremen employees the duty of exercising due care "under the circumstances."

The Court instructed that under those circumstances:

This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are

known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious or anticipated by him if reasonably competent in the performance of his work. *Id.,* at 416, n. 18, 89 S.Ct. 1144, 1151–1152 n. 18, 22 L.Ed.2d 371.

7. The Fifth Circuit has adopted and expanded upon the *Kemarec* rationale when no stevedore is involved, holding that a defendant owes a plaintiff a duty of ordinary care, which includes a duty to warn only of harm that is reasonably foreseeable. *Casaceli v. Martech International, Inc., supra,* at 1328; *Daigle v. Point Landing, Inc.,* 616 F.2d 825 (5th Cir.1980).

8. Penrod argues that *Daigle v. Point Landing, Inc., supra,* disposes of the Plaintiff's cause of action. In *Daigle,* a dockman was injured while working on a winch on the dock. As a cable wrapped on the winch became tangled in a tug's wheel alongside the dock, the tug's master applied power, causing a strain on the cable which resulted in the plaintiff's injury. *Id.,* at 828.

The Fifth Circuit held that because the master of the tug did not know or have reason to suspect that the vessel's maneuvering endangered the plaintiff's safety, he was not legally obliged to warn the plaintiff of the vessel's movements. *Id.,* at 828.

■ 10. Penrod's reliance on *Daigle* is misplaced. Unlike the scenario presented in *Daigle,* the Penrod employees were clearly aware of specific dangers inherent in the use of the stabbing board platform. The uncontradicted testimony demonstrated that Penrod's employees knew that, when extended, the flap of the platform was too long to avoid contact with the dolly rails unless it was in a retracted position. The same Penrod employees were aware that the counterweight was not guaranteed to automatically lift the flap to clear the rail everytime the stabber stepped off the platform. Plaintiff, however, was unaware of this, and his testimony on balance was more credible than that of Penrod's employees. Because they had knowledge of the proper way to operate the equipment, the Penrod employees were under a duty to warn Plaintiff that the flap was not guaranteed to automatically retract.

11. Similarly, the Penrod employees had a duty to warn Plaintiff that the manual safety locks had to be in place at all times throughout casing operations. Again, the uncontroverted testimony demonstrated that all the Penrod employees were aware that in order to ensure maximum safety, the locks had to be in place. Plaintiff, however, had never been on a stabbing board with this particular arrangement before and believed that his job was safer and easier if he manually raised the platform with the winch to enable him to get closer to the pipe which varied in length. At the least, the Penrod employees should have accompanied the stabber on the platform at the commencement of operations and demonstrated how to properly use the stabbing board. In sum, Penrod was negligent under these circumstances for failing to provide Plaintiff with adequate timely warnings, all of which resulted in an unsafe place to work.

12. Penrod argues, *citing Martinez v. Dixie Carriers, Inc.,* 529 F.2d 457 (5th Cir.1976), and *Casaceli v. Martech International Inc., supra,* that, because Plaintiff was a stabber who performed a specialized task, Penrod was entitled to rely upon his expertise and was therefore entitled to reduce or omit the warnings given accordingly. Penrod's argument is much more appropriately applied to a situation in which the stabber had considerable experience operating the same improvised equipment. However, the fact that Dunn had never been on a stabbing board with a flap like that on the Penrod 74 and the fact that Penrod's employees were fully aware of this unusual arrangement dictates reaching the opposite conclusion under these circumstances. Penrod should have taken extra precautions to ensure that Dunn was adequately warned about the hazards peculiar to the Penrod 74 stabbing board.

13. Viewing the circumstances surrounding the Plaintiff's accident in their totality, the Court has no choice but to conclude that Penrod failed to meet the legal standard required under *Kermarec*. While Plaintiff labored to develop and present enough credible evidence to meet the applicable "preponderance" standard, Penrod incorrectly assumed that Plaintiff would fail to meet its burden of proof at the trial and did little affirmatively to help the Court's understanding of the details of the casualty. As a consequence, based on the existing record, the Court has little difficulty in concluding that Plaintiff has successfully established liability due to Penrod's failure to exercise reasonable care under the circumstances. *See Dove v. Belcher Oil Co.*, 686 F.2d 329, 333 (5th Cir.1982); *Gele v. Chevron Oil Co.*, 574 F.2d 243, 248 (5th Cir.1978); *Gibboney v. Wright*, 517 F.2d 1054, 1059 (5th Cir.1975).

### Products Liability

14. Plaintiff persists in urging this theory as a basis for liability. While the Court rejects Plaintiff's position, the legal area is analyzed since concepts of products liability including negligence and strict liability have been incorporated in general maritime law. *East River S.S. v. Transamerica Delaval*, — U.S. —, —, 106 S.Ct. 2295, 2299, 90 L.Ed.2d 865, 873 (1986).

15. Evolving case law relating to injuries of maritime workers has long pointed in that direction. *See Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 94, 66 S.Ct. 872, 877, 90 L.Ed. 1099 (1946) (imposing strict liability for unseaworthiness); *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 321, 84 S.Ct. 748, 752, 11 L.Ed.2d 732 (1964) (imposing strict liability for breach of implied warranty of workmanlike service).

16. The doctrine of strict liability as enunciated in the Restatement (Second) of Torts § 402A has been adopted as the rule governing products liability claims in tort in Texas. *Armstrong Rubber Co. v. Urquidez*, 570 S.W.2d 374 (Tex.1978); *Rourke v. Garza*, 530 S.W.2d 794 (Tex.1975); *Darryl v. Ford Motor Company*, 440 S.W.2d 630 (Tex.1969).

17. The Restatement imposes liability on sellers of defective products that are unreasonably dangerous and cause damage to a user or consumer. The rule applies to any person engaged in the business of selling products for use or consumption. *Armstrong Rubber Co. v. Urquidez, supra*, at 375, *citing* Restatement (Second) of Torts § 402A, comment f (1965).

18. Although phrased in terms of sellers, it is not necessary that the defendant actually sell the product, but only that he be engaged in the business of introducing the product into channels of commerce. *See, Rourke v. Garza, supra*.

Texas courts have not demanded literal adherence to section 402A's requirement that the defendant "sell" the product. Strict liability applies to those who lease products. *Rourke v. Garza, supra*. The theory has also been applied to those who distribute free samples in hope of making future sales. *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.1967).

19. A crucial element required to establish products liability in Texas is that the product producing injury or damage must enter the stream of commerce. *Gardner v. Chevron, Inc.*, 675 F.2d 658 (5th Cir.1982); *Armstrong Rubber Co. v. Urquidez, supra; General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 351 (Tex.1977).

20. Texas courts have declined to extend the doctrine of strict liability in tort to bailment transactions where the product remains within the industrial testing process and never enters the stream of commerce. *Armstrong Rubber Co. v. Urquidez, supra*.

21. The terms "channels of commerce" imply that a product is placed for use by or sale to the consuming public. The term "interstate commerce" is distinct, referring generally to the scope of federal regulation. Merely because a product is employed in interstate commerce does not necessarily mean that it is in the channels of commerce. *Thate v. Texas and Pacific Ry. Co.*, 595 S.W.2d 591 (Tex.Civ.App.—Dallas 1980, no writ) (holding that the railroad

was not liable under strict products liability to a trucking company worker injured while unloading trailers on a flatbed car supplied by the railroad).

22. The Fifth Circuit has observed that the rationale for imposition of strict liability is served only if the defendant is in the business of releasing products into the stream of commerce. The existence of a business justifies consumer reliance and the assumption that the seller has undertaken a special responsibility for product safety and supports the mechanism for spreading the loss. *Galindo v. Precision American Corp.*, 754 F.2d 1212 (5th Cir. 1985).

■ 23. Plaintiff argues that Penrod is liable under a strict liability analysis as a "manufacturer" of the vessel which released the stabbing board into the channels of commerce by "leasing" or chartering the vessel to Phillips Petroleum. Plaintiff urges the Court to adopt the Texas Supreme Court's reasoning in *Rourke v. Garza, supra.* In *Rourke*, the court held that where a rental company delivered unassembled scaffolding to a construction company and the scaffolding was unreasonably dangerous when assembled, the rental company was subject to strict liability. *Id.*, at 800.

*Rourke*, however, is clearly distinguishable. In this case, Penrod supplied specifications to a designer primarily for its own use. At all times Penrod employees maintained control over the vessel. One Phillips Petroleum representative remained on the Penrod 74 throughout casing operations. Penrod at all times owned and operated the rig. No evidence was presented to suggest that Penrod transmitted or released the rig to the consuming public. Therefore, Plaintiff is not entitled to recover based on products liability theories. *See Gardner v. Chevron, Inc.*, 675 F.2d 658 (5th Cir.1982) (where Chevron assigned and constructed an oil well for its own use, strict liability in tort was inapplicable as a matter of law).

### Damages

25. Recovery of damages in this case is governed by general maritime law.

26. Courts have long recognized that non-pecuniary losses are recoverable under general maritime law. *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974) (recovery permitted for loss of support, services and society, as well as for funeral expenses).

■ 27. Recovery of damages under general maritime law is broader than recovery under the Jones Act. *Ivy v. Security Barge Lines, Inc.*, 606 F.2d 524 (5th Cir. 1979), cert. denied, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 815 (1980) (Jones Act survivors limited to pecuniary losses; Congress did not intend to provide Jones Act liability for non-pecuniary losses, such as loss of society); *Cruz v. Hendy International Co.*, 638 F.2d 719 (5th Cir. Feb. 1981); *Hlodan v. Ohio Barge Line, Inc.*, 611 F.2d 71 (5th Cir.1980).

■ 28. In cases where negligence is alleged under general maritime law, an injured plaintiff is entitled to recover compensatory damages including pain and suffering. *See, e.g., De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138 (5th Cir.1986); *Ivy v. Security Barge Lines, Inc.*, supra (in a Jones Act context); *Casaceli v. Martech International, Inc., supra.*

■ 29. Although not alleged or proved to be applicable in this case, punitive damages are also recoverable under general maritime law upon a showing of willful or wanton misconduct by the shipowner. *In re Merry Shipping Inc.*, 650 F.2d 622 (5th Cir. Unit B 1981); *In re Marine Sulphur Queen*, 460 F.2d 89 (2nd Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972).

■ 30. Where properly plead and proven, a plaintiff is entitled to recover past lost earnings and for the loss of future earning capacity.

31. In its en banc decision, *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983), cert. denied, 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984) (hereafter *"Culver II"*), the Fifth Circuit established guidelines to be used to calculate future lost earnings. A four step procedure is to be

applied to calculate damages suffered either by a person whose personal injuries will result in extended future disability or by the representatives of a deceased person. Those steps are: estimating the loss of work life resulting from the injury or death, calculating the lost income stream, computing the total damage, and discounting that amount to its present value. *Id.*, at 117.

32. When discounting the total damage award to present value, a below-market interest rate is applied which guards against disparities that result when forecasts of future price inflation are used. *Culver II*, at 121, *citing Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983).

33. The paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned. *Culver II*, at 120.

■ 34. The Plaintiff's economic analysis governing Dunn's anticipated future lost earnings is inadequate; it requires the Court to engage in unrealistic speculation because the expert's analysis was incomplete and lacked credibility. Three alternative scenarios were presented. In the first, Plaintiff would remain with Weatherford and rapidly move up in the company. The second scenario assumed Dunn would return to mainstream drilling at the age of thirty-six and perform the manual labor of a roughneck or roustabout. The third scenario assumes Dunn will return to mainland Australia and go through extensive retraining. (Testimony of Hawkins).

The first two versions fail to take into account the general decline in the offshore oil industry and its accompanying high rate of unemployment. They are also based on a speculative rate of promotion and wage increases within Weatherford and mainstream drilling that was not supported by sufficient evidence to satisfy the burden of proof. Evidence was introduced showing that Weatherford was implementing company-wide wage cuts. The economic analysis presented failed to take this factor into account. Although case law makes it clear that absolute certainty is impossible, considerations of fairness dictate that the economic analysis be realistic. For the Court to assume that Dunn would remain gainfully employed in the oil industry for the rest of his working life with the rapid promotions and wage increases he claims is to ignore reality. Absent more concrete evidence that Plaintiff will, in fact, lose the income he claims, the Court has no choice but to conclude that the Plaintiff has failed to establish by a preponderance of the evidence his entitlement to future lost wages.

The third scenario was virtually abandoned by Plaintiff's counsel in closing argument and is therefore appropriately disregarded. More importantly, the economic analysis ignores the apparent fact that since the accident Dunn has proven himself to be a valued employee easily capable of future advancement within Weatherford. It is highly unrealistic based on this evidence to conclude that the Plaintiff would abandon his computer work with Weatherford, take a tremendous pay cut and begin extensive retraining in another field.

35. Evidence was presented and the Defendant conceded that Plaintiff received his salary throughout his recuperation period with the exception of a $30 per day offshore bonus for fifteen days each month for five months, totalling $2,250.00.

36. Although Plaintiff would ordinarily be entitled to recover medical expenses, no bills or invoices or other proof were submitted to substantiate his claim. Accordingly, none will be awarded.

■ 37. In calculating the amount of damages Plaintiff is entitled to recover for past pain and suffering, several factors were considered. Those factors include the necessity of four major operations including skin grafts, the pain and incapacity incurred in those operations, the protracted period of recovery necessarily involved, the physiotherapy required for recovery and the accompanying loss of the use of Plaintiff's hand during this period of time. The Court has also factored in the extreme pain, discomfort, shock and disorientation

experienced by the Plaintiff from the time of his injury throughout his journey from Puto Princessa through Manila and finally to Singapore where he received major medical treatment. The Court concludes that the sum of $75,000 reasonably compensates the Plaintiff for these elements of damages.

38. An award for disfigurement is based on an examination of Plaintiff's injury and a consideration of its effect on his daily activities. Due to the extreme scarring and skin grafts covering the left hand, an award of $50,000 will reasonably compensate the Plaintiff for the disfigurement resulting from his injury.

■ 39. Future pain and suffering represents the most difficult component of damages to compute. In arriving at an appropriate figure, the trier of fact must realistically assess the evidence presented while maintaining an awareness that advances in medical technology could conceivably reduce such an award to mere speculation. The reasonableness of the award however turns solely on the concrete evidence presented. The medical evidence introduced at trial demonstrates that Dunn continues to suffer from pain and aching in cold weather, either due to the presence of scar tissue or to damaged blood vessels. Dunn will also suffer in the future due to his permanent impairment resulting in a decreased ability to perform certain tasks and participate in sports and hobbies. Considering these factors, the Court concludes that an award of $35,000 is reasonable and adequate compensation for future pain and suffering.

40. Considering Plaintiff's injury in total, the Court finds that the following award reasonably compensates Dunn for his injury.

| | |
|---|---|
| Past lost wages | $ 2,250.00 |
| Past pain and suffering | 75,000.00 |
| Disfigurement | 50,000.00 |
| Future pain and suffering | 35,000.00 |
| TOTAL | $162,250.00 |

■ 38. An award of prejudgment interest is within the Court's discretion. *Pluyer v. Mitsui O.S.K. Lines, Ltd.*, 664 F.2d 1243, 1248 (5th Cir.1982). Prejudgment interest is ordinarily granted in admiralty unless there are exceptional or peculiar circumstances that would make it inequitable for the losing party to be forced to pay prejudgment interest. *Socony Mobil Oil Co. v. Texas Coastal and International, Inc.*, 559 F.2d 1008 (5th Cir.1977); *American Zinc Co. v. Foster*, 441 F.2d 1100 (5th Cir.), *cert. denied*, 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95 (1971). The record reveals that the five year period of time which elapsed between injury and judgment was primarily due to the Plaintiff's inability to appear in the United States and the fact that suit was not filed until three years after the injury. Because the delay was caused by the Plaintiff's inaction, an award of prejudgment interest would be inequitable. Therefore, Plaintiff's request for prejudgment interest is denied.

39. In reaching these conclusions the case required critical determinations on the credibility of witnesses. The Court finds that the Plaintiff was a more credible and believable witness than the Defendant's witnesses who opposed his testimony. Therefore, the Court has adopted a position with regard to liability that reflects these credibility determinations.

40. To the extent that the foregoing Findings of Fact are considered Conclusions of Law, they are adopted as such. To the extent that the Conclusions of Law are considered Findings of Fact, they are adopted as such.

Counsel will prepare and submit an appropriate judgment within twenty (20) days incorporating these Findings of Fact and Conclusions of Law.