**REVISED December 16, 2013**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 12-20610

United States Court of Appeals
Fifth Circuit

**FILED**

December 6, 2013

Lyle W. Cayce
Clerk

WEEKS MARINE, INCORPORATED,

Plaintiff-Appellant

v.

STANDARD CONCRETE PRODUCTS, INCORPORATED,

Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS and JONES, Circuit Judges, and MILAZZO, District Judge.[*]

JONES, Circuit Judge:

This case revolves around the terms of an indemnity agreement between Weeks Marine, Inc. ("Weeks Marine") and Standard Concrete Products, Inc. ("Standard Concrete"). In 2011, John Johnson, Jr., ("Johnson") filed suit in Alabama state court against several entities, including Weeks Marine and Standard Concrete, for the injuries that he allegedly sustained when he fell from his crane while working on the I-10 Mississippi River Bridge fender replacement and reconditioning project ("the Project").[1] In the present case,

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

[1] The underlying litigation is styled *John Johnson, Jr., et ux. v. Hesler Industries, Inc., et al.*, Circuit Court of Mobile County, Alabama, Civil Action No. 2011-900374.

No. 12-20610

Weeks Marine, the general contractor on the Project, seeks a declaration that Standard Concrete, Johnson's employer, is contractually obliged to defend and indemnify it in the underlying state court action. Because the indemnity agreement is not applicable to the underlying suit, we affirm the judgment in favor of Standard Concrete.[2]

## BACKGROUND

Shortly after Weeks Marine was selected as general contractor for the Project, it accepted Standard Concrete's bid for the manufacture of pre-cast concrete fender modules. The parties executed a contract, which consists of two documents: Purchase Order No. 161845 ("Purchase Order") and the Additional Terms and Conditions ("Additional Terms"). The present dispute involves the following provisions from the contract:

> **Description of Material** (Purchase Order): Seller (Standard Concrete) shall furnish all supervision, equipment, forms, materials, labor, supplies, fabrication, coatings, quality control, etc. to provide pre-cast fender modules.

> **Paragraph 2** (Purchase Order): Inserts: Buyer (Weeks Marine) to provide all inserts for shear keys and whalers and lift hardware. Seller (Standard Concrete) to install lift hardware to facilitate lifting and handling.

> **Paragraph 10** (Purchase Order): Property and Personal Liability: Seller (Standard Concrete) shall save harmless and indemnify Buyer (Weeks Marine) from and against all claims, suits (including counsel fees and other expenses), judgments and awards stemming from any damage to property or injury (including death) to persons (including any damage or injury to the property or the person of any employee of either Buyer or Seller

---

[2] Accordingly, we do not reach Weeks Marine's argument that the agreement is enforceable under Texas's fair notice requirements for indemnity agreements. *Cf. Coastal Mart. Inc. v. Southwestern Bell Telephone Co.*, 154 S.W. 3d 839, 843 (Tex. App. Corpus Christi 2005) (providing that the determining the scope of coverage is the "starting point" for resolving an indemnity dispute).

No. 12-20610

which may be caused or alleged to have been caused in whole or in part by, or which may occur or be alleged to have occurred in connection with the execution of this Purchase Order by Seller (Standard Concrete), or the use of the items furnished hereunder, excepting Buyer's (Weeks Marine) sole negligence.

**Paragraph 4** (Additional Terms):  Indemnification will be limited to actual damages relating to workmanship of Seller's (Standard Concrete) product.  In no event is Seller (Standard Concrete) liable for indirect or consequential damages.  Total damages are limited to $500,000.00.

**Paragraph 6** (Additional Terms): It is mutually agreed that any provision in the purchase order which would modify, conflict with, or contradict any of these terms and conditions, shall be deemed to be null and void.

On March 10, 2009, seven months after the parties executed the contract, Johnson sustained the alleged injuries that form the basis of the underlying suit.  In his state court pleadings, Johnson alleges that he fell from a "corner module" or "steel module" that was designed by Modjeski & Masters, Inc., manufactured by Helser Industries, Inc., and contracted for by Weeks Marine. The complaint describes the incident as occurring in the following manner:

[Johnson] was attempting to disassemble the corner module (hereinafter "corner module" or "steel module") by lifting it away from a concrete form using a crane.  Mr. Johnson placed two eye-hooks in pre-drilled holes in the top of the steel module.  However, the eye-hooks could not be secured from the top.  Instead, Mr. Johnson had to secure the eye-hooks to the module by placing a nut on the eye-hooks from the underside.  Unlike in other locations on that and other modules, there were no pre-welded nuts on the underside of the holes in the corner module where the eye-hooks were placed.  When Mr. Johnson attempted to secure the eye-hook to the corner module, he fell approximately fourteen feet to the ground.

After Weeks Marine was served with Johnson's complaint, it sent demand letters to Standard Concrete, seeking defense and indemnification in

No. 12-20610

the state court action.  When Standard Concrete concluded that it had no duty to defend or indemnify, Weeks Marine sought declaratory relief in federal court, and Standard Concrete counter-claimed.  Cross-motions for summary judgment were filed.  The district court referred the motions to a magistrate judge, who issued a Report and Recommendation ("Report"), concluding that the court should grant Standard Concrete's motion for exoneration from defense or indemnification.  The district court adopted the magistrate judge's Report and dismissed the case.  Weeks Marine filed a timely appeal.

## STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*, applying the same standards as the district court.  *St. Paul Surplus Lines Ins. Co. v. Settoon Towing*, *L.L.C.* (*In re Settoon Towing, L.L.C.*), 720 F.3d 268, 275 (5th Cir. 2013).  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We must view all facts and evidence in the light most favorable to the non-moving party when considering a motion for summary judgment.  *Dameware Dev., L.L.C. v. Am. Gen. Life Ins. Co.*, 688 F.3d 203, 206-07 (5th Cir. 2012) (citation omitted).  The interpretation of a contractual indemnity provision is a question of law that is also reviewed *de novo.  Becker v. Tidewater, Inc.*, 586 F.3d 358, 369 (5th Cir. 2009).

Under the Purchase Order's choice of law provision, disputes between Weeks Marine and Standard Concrete must be resolved under Texas law.  Such choice-of-law provisions are unquestionably enforceable, *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677-78 (Tex. 1990)); Restatement (Second) of Conflict of Laws § 187.

Texas courts apply general contract law principles when construing indemnity agreements.  *Ideal Lease Service, Inc. v. Amoco Production Co.*,

4

662 S.W.2d 951, 952-953 (Tex. 1983). The primary concern of contract interpretation under Texas law is to ascertain the true intentions of the parties as expressed in the instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). Texas courts examine the entire contract in an effort to harmonize and give effect to all provisions so that none is rendered meaningless. *Id.*

Under Texas law, the duties to defend and indemnify "are distinct and separate duties" and "enjoy a degree of independence from each other." *D.R. Horton-Texas, Ltd. v. Markel Int'l Ins. Co.*, 300 S.W. 3d 740, 743-44 (Tex. 2009). The "duty to defend" is the broader of the two. *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 528 (5th Cir. 2004). It is "circumscribed by the eight-corners doctrine," so that it is determined solely by the language of the indemnity provision and the allegations in the third-party pleadings. *Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 594 (5th Cir. 2011). Moreover, the court must review the third-party pleadings "without regard to the truth or falsity of those allegations." *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006). The duty to indemnify, by contrast, "is triggered by the actual facts that establish liability in the underlying lawsuit." *Guar. Nat'l Ins. Co. v. Azrock Indus. Inc.*, 211 F.3d 239, 243 (5th Cir. 2000).

## DISCUSSION

### *Duty to Defend*

Applying the eight-corners rule here, the indemnity agreement and Johnson's pleadings govern whether Standard Concrete owes Weeks Marine a defense. If Johnson's factual allegations potentially support a claim covered by the indemnity agreement, then Standard Concrete's duty to defend is invoked. *GuideOne Elite Ins. Co.*, 197 S.W.3d at 310 (citation omitted).

No. 12-20610

Paragraph 10 of the Purchase Order requires Standard Concrete to "save harmless and indemnify Buyer (Weeks Marine) from and against all . . . suits (including counsel fees and other expenses)."  Paragraph 4 of the Additional Terms, however, limits indemnification to "actual damages relating to the workmanship of Seller's (Standard Concrete) product."  Since the Additional Terms also provide that any term in the Purchase Order modified by one of the Additional Terms is "null and void," the limiting language in the Additional Terms controls.[3]  Thus, the indemnity agreement, read as a whole, does not require Standard Concrete to defend Weeks Marine in suits where the claim for damages is unrelated the workmanship of Standard Concrete's product.

In the underlying complaint, Johnson alleges that he fell and was injured while "attempting to disassemble the corner module."  According to Johnson's complaint, the module was designed, manufactured and contracted for by companies other than Standard Concrete.    Johnson asserts that that he was unable to secure eye-hooks to the pre-drilled holes on the top of the corner module, and as a result, he resorted to placing a nut on the eye-hooks from the underside.  He further claims that the corner module lacked a pre-welded nut on the underside, preventing him from simply securing the eye-hooks to the module from the topside.

The Fifth Circuit has characterized a defect in workmanship as a defect in the way some part of a product is constructed.  *U.S. Industries, Inc. v. Aetna Cas. & Sur. Co.*, 690 F.2d 459, 462-63 (5th Cir. 1982) (citation omitted).  Workmanship relates to the quality of a product, and does not include damage to a product caused by negligence when the product is used during the construction process.  *Id*.  Johnson's complaint, however, attributes his

---

[3] Further, both sides agree that Paragraph 4's words "indemnification will be limited to" refers to the indemnification agreement as a whole, not just the duty to indemnify.

accident to the construction process used by him and his crew. Alternatively, Johnson alleges a defect in the corner module, but the module is not a Standard Concrete product. The steel modules are a component that Standard Concrete used to make *its* product; they are not the product itself. Standard Concrete's products are the pre-cast concrete fender modules. The common usage of "product" distinguishes this term from components, tools, and equipment used in the manufacturing process. *See* BLACK'S LAW DICTIONARY 1328 (9th ed. 2009) (defining "product" as "something that is distributed commercially for use or consumption"). As Standard Concrete did not distribute steel modules for consumption or use, Johnson has not stated a claim related to the workmanship of Standard Concrete's product. Thus, Standard Concrete has no duty to defend Weeks Marine in the underlying action.

In reaching this conclusion, we considered Weeks Marine's arguments for finding a duty to defend, but found them unpersuasive. First, Weeks Marine contends that because the "Description of Materials" provision of the Purchase Order required Standard Concrete to provide metal forms, these forms constitute Standard Concrete's product under the indemnity agreement. Weeks Marine may have prevailed under this theory had the indemnity agreement consisted only of Paragraph 10 of the Purchase Order, which covered all claims stemming from the execution of the Purchase Order. However, the parties modified Paragraph 10 with an additional term that requires indemnification only with respect to claims related to the workmanship of Standard Concrete's product. As explained immediately above, the product subject to indemnification under the indemnity agreement is the concrete fenders, not the forms that Standard Concrete used in making them.

Second, Weeks Marine invokes *Fresh Coat, Inc. v. K-2, Inc.*, 318 S.W. 3d 893 (Tex. 2010), where the Texas Supreme Court held that synthetic stucco

components, collectively referred to as EIFS, were a "product." *Fresh Coat*, 318 S.W. 3d at 897. In so holding, the court rejected the definition of product put forth by K-2, the manufacturer of EIFS, which argued that EIFS was no longer a product once it was installed on the walls of homes. *Id.* The court held instead that a product within the meaning of Texas's products liability statute is "something distributed or otherwise placed, for any commercial purpose, into the stream of commerce for use or consumption." *Id.*

*Fresh Coat*'s definition of "product," however, offers Weeks Marine no relief. In order to enter the steam of commerce, a product must be released in some manner to the consuming public. *Armstrong Rubber Co., v. Urquidez*, 570 S.W. 2d 374, 376-77 (Tex. 1978) ("The defective tire . . . always remained within the industrial testing process. Accordingly, the tire never entered the stream of commerce."); *Thate v. Texas & Pacific Rwy. Co.*, 595 S.W.2d 591, 599 (Tex. Civ. App.—Dallas 1980, no writ) (noting that defendant-railroad never released a railroad car used in defendant's business to an ordinary user or consumer).[4] Here, there is no fact issue as to whether Standard Concrete placed the steel forms into the stream of commerce. The Purchase Order demonstrates that the concrete fender modules are the product that Standard Concrete made for a commercial purpose. The document provides that Standard Concrete is to sell Weeks Marine a specified number of these modules at a certain price. Although it is true that the Purchase Order also indicates

---

[4] *See also Gardner v. Chevron U.S.A., Inc.*, 675 F.2d 658, 661 (5th Cir. 1982) (holding that defendant was not liable because it was not engaged in business of selling the product at issue); *Dunn v. Penrod Drilling Co.*, 660 F. Supp. 757, 769 (S.D. Tex. 1987) (stating that Penrod employees at all times maintained control over a rig and there was no evidence that Penrod ever released the rig to the consuming public); *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 89 (Tex. 2004) (noting that FFE was the end user and consumer of a trailer used to transport its own cargo and never released that allegedly defective product to an ordinary user or consumer); *Hernandez v. So. Pac. Transp. Co.*, 641 S.W.2d 947, 952 (Tex. App.—Corpus Christi 1982, no writ) (finding no evidence that the defendant-railroad released stanchions it used in its business into the stream of commerce).

No. 12-20610

that Standard Concrete must "furnish all supervision, equipment, forms, materials, labor, supplies, fabrication, costings, quality control, etc.," the purpose of these provisions is clearly stated: ". . . to provide pre-cast fender modules." Further, the Purchase Order indicates that Standard Concrete is to load the finished concrete modules onto Weeks Marine's barges, but nowhere does it say that Standard Concrete must load any steel forms for shipping or otherwise distribute the forms into the stream of commerce. In sum, *Fresh Coats* shows only that Standard Concrete could have been liable for any defects in its concrete fenders even though the fenders are ultimately components of the bridge project. However, it does not extend Standard Concrete's duty to defend against claims allegedly caused by the steel forms that, unlike EIFS in *Fresh Coats* or the concrete modules here, are not distributed commercially by the indemnitor.

Finally, Weeks Marine asserts that Paragraph 2 of the Purchase Order, which requires Standard Concrete "to install lift hardware to facilitate lifting and handling," demonstrates that the metal forms are Standard Concrete's product. Although Weeks Marine's brief is not entirely clear, it appears that the contention here is that the workmanship of the steel forms is at issue in the underlying litigation because Standard Concrete did not properly install lift hardware on them as required. Weeks Marine thus states that Paragraph 2 obliged Standard Concrete "to install the specific hardware *on the metal forms* necessary to lift and manipulate *the metal forms* during the process of molding the pre-cast concrete modules." Br. of Appellant at 17 (emphasis added).

Contrary to Weeks Marine's claim, Paragraph 2 does not specify that the lift hardware must be installed on the steel forms. It is more reasonable to interpret Paragraph 2 as requiring Standard Concrete to install lift hardware on the finished pre-cast concrete fenders (after they are removed from the steel

9

corner modules used to form them) as part of Standard Concrete's responsibility to load the concrete fender modules onto Weeks Marine's barges after completion. Assuming *arguendo* that these circumstances are consistent with more than one fact and nothing shows that one is more probable than the others, none of the facts can be inferred. *Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex. App—Houston [1st Dist.] 1993, writ dism'd w.o.j.) (op. on mo. for rehearing). As Weeks Marine offers no evidence supporting its interpretation of Paragraph 2, there is no triable issue of fact based on the language of this provision.[5]

### *Duty to Indemnify*

Weeks Marine's argument that Standard Concrete is required to hold Weeks Marine harmless from any damages in the underlying litigation depends on the premise that Johnson's alleged injuries fall within the scope of the indemnity agreement. For the reasons already discussed, we conclude that the indemnity agreement does not cover the underlying state court action. This, however, does not end our inquiry because unlike the duty to defend, the duty to indemnify "is triggered by the actual facts that establish liability in the underlying lawsuit." *Guar. Nat'l Ins. Co.,* 211 F.3d at 243. As a result, the court may consider facts outside of those alleged in Johnson's complaint to determine the scope of Standard Concrete's duty to indemnify. *Gilbane Bldg. Co.*, 664 F.3d at 594. Here, the magistrate judge's Report noted that Weeks Marine "submitted no evidence that Mr. Johnson's injuries were caused by or

---

[5] Standard Concrete offers a legitimate argument that Weeks Marine waived the stream of commerce and lift hardware arguments by raising them for the first time on appeal without appropriate justification. Indeed, the absence of discussion of these issues below may explain the lack of factual meat on the bones of Weeks Marine's arguments. Although Weeks Marine did not address the waiver question in its reply brief, we nevertheless entertained Appellant's claims as to *Fresh Coats* and Paragraph 2 out of an abundance of caution, and hold both to be unavailing.

related to the workmanship of Standard Concrete's product." *Weeks Marine, Inc. v. Standard Concrete Products, Inc.*, No. 4:11-CV-03230, at 11 (S.D. Tex., filed on June 1, 2012).  On appeal, Weeks Marine points to no facts that lead us to conclude otherwise.  Instead, it argues that it is premature, as a matter of law, to dismiss its indemnification claim with prejudice. However, courts have recognized that there are situations in which there is no duty to defend, "and the same reasons that negate the duty to defend likewise negate any possibility that the [indemnitor] will ever have a duty to indemnify." *Columbia Cas. Co. v. Georgia & Florida RailNet, Inc.*, 542 F.3d 106, 111 (5th Cir. 2008) (citation omitted).  This is such a case.

## CONCLUSION

Accordingly, we AFFIRM the district court's judgment.