# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 14-40494

LCS CORRECTIONS SERVICES, INCORPORATED,

 Plaintiff - Appellee

v.

LEXINGTON INSURANCE COMPANY,

 Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

September 2, 2015

Lyle W. Cayce
Clerk

————

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Consolidated with 14-40587

LCS CORRECTIONS SERVICES, INCORPORATED,

 Plaintiff - Appellant

v.

LEXINGTON INSURANCE COMPANY,

 Defendant - Appellee

v.

MONICA GARCIA, Individually and as Heir and Representative of the Estate of Mario A. Garcia, Deceased, and as next friend of P.G., a Minor,

 Defendant - Appellant

No. 14-40494 cons/w No. 14-40587

---

Appeals from the United States District Court
for the Southern District of Texas

---

Before JOLLY, WIENER, and CLEMENT, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This insurance dispute requires us to decide whether Lexington Insurance Company must defend and indemnify LCS Corrections Services, Inc., against a claim that LCS's alleged failure to provide medications to an inmate housed at one of its facilities caused the inmate's death. Two insurance contracts are at issue in this appeal: a Commercial General Liability ("CGL") policy and a Commercial Umbrella Liability ("CUL") policy. The district court, in separate rulings, held that, under the CGL policy, Lexington had a duty to defend LCS, but without reaching the indemnification issue under that policy; and that, under the CUL policy, Lexington had no duty to defend or indemnify LCS. For the reasons that will follow, we vacate the district court's judgment in part and hold that Lexington is not required to defend or indemnify LCS under the CGL policy, and affirm the district court's judgment in part and hold that Lexington is not required to defend or indemnify LCS under the CUL policy. Thus, we AFFIRM in part, VACATE in part, and REMAND the case for entry of judgment in favor of Lexington.

I.

This dispute over the insurance policies stems from a tort action by the heirs (the "Plaintiffs") of Mario Garcia ("Garcia").[1] Garcia was confined at the Brooks County Detention Center (the "Detention Center") in Falfurrias, Texas, after pleading guilty to a federal offense. LCS, a Louisiana corporation, owns

---

[1] The underlying tort claims are pending before another federal district court.

a number of private prison facilities, and operates the Detention Center. At the time Garcia was incarcerated, he was taking high doses of benzodiazepine, as prescribed by his personal physician. The Plaintiffs claim that Garcia died because officials at the Detention Center refused to provide him with additional doses of benzodiazepine.

After Garcia's death, the Plaintiffs filed suit against LCS, alleging claims of medical malpractice under state law and constitutional violations under 42 U.S.C. § 1983. Initially, in the previous tort litigation that underlies this appeal, the district court allowed only the medical malpractice claims to go to trial. In that trial, a jury returned a $2.25 million verdict in favor of the Plaintiffs.[2] Following that trial, the district court agreed to reinstate the Plaintiffs' § 1983 claim. In response to the district court's ruling, the Plaintiffs filed their Fifth Amended Complaint (the "Complaint"), which alleges that LCS's policy of refusing to administer certain medications to inmates constituted deliberate indifference to Garcia's serious medical needs.

LCS then filed this separate action in another district court, seeking a declaration that Lexington is required to defend and indemnify LCS in the underlying § 1983 action. Thus, this declaratory judgment appeal involves only the question of insurance coverage and only for the § 1983 claim. This appeal, however, implicates two insurance policies.

By way of background, Lexington issued three policies to LCS—the CUL and CGL policies that are at issue in this suit, along with a Healthcare Professional Liability ("HPL") policy, which is not a subject of this appeal.[3]

---

[2] Specifically, the jury found that "LCS Corrections Services, Inc. employees" were responsible for Garcia's death. The jury also concluded that two named healthcare professionals, Dr. Michael Pendleton and Kelli Savage (a nurse), were not legally responsible for Garcia's death.

[3] Lexington defended LCS in the initial trial on the medical malpractice allegations under the HPL policy. Indeed, Lexington continues to defend LCS in the ongoing litigation

No. 14-40494 cons/w No. 14-40587

Both the CUL and CGL policies insure LCS against "bodily injury" or "property damage" caused by an "occurrence," defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Additionally, the CGL policy, but not the CUL policy, includes a civil rights endorsement, which extends the insurance agreement to cover certain civil rights claims.

More particularly, this appeal primarily involves two exclusions, one from each policy: a "medical services" exclusion to the CGL policy, and a "professional liability" exclusion to the CUL policy. Common to each policy, LCS and the Plaintiffs contend that the Complaint alleges that the injury Garcia suffered resulted from covered administrative or non-professional services; whereas Lexington counters that the alleged injury occurred because LCS denied Garcia his medication, constituting a failure of LCS to render a medical or professional service, which is excluded from coverage in the respective policies. Both LCS and Lexington moved for summary judgment. The district court ruled for the Plaintiffs and LCS on the CGL policy, and ruled for Lexington on the CUL policy.

II.

So, we turn to the merits of this declaratory judgment appeal, seeking an answer only to insurance coverage for the underlying § 1983 claim: whether Lexington owes a duty to defend and/or indemnify LCS, under either the CGL or the CUL policies.[4] Under both Texas and Louisiana law, the duty to defend

---

under the HPL policy, but the limits of that policy may be exhausted if the § 1983 litigation is ultimately successful.

[4] LCS and the Plaintiffs suggest that some of the issues in this appeal are not ripe for review. Specifically, they argue that the duty to indemnify is unripe as to both the CGL and CUL policies, relying on Texas state law precedent that the duty to indemnify is generally determined only after the underlying litigation that gives rise to the potential duty to indemnify draws to a close. *See Farmers Tex. Cty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997) (per curiam). Although Lexington admits that the Plaintiffs' underlying § 1983

and the duty to indemnify are separate duties, determined by differing principles. *Weeks Marine, Inc. v. Standard Concrete Prods., Inc.*, 737 F.3d 365, 369 (5th Cir. 2013) (recognizing that the duty to indemnify and the duty to defend are distinct duties under Texas law); *see also Cambridge Integrated Servs. Grp., Inc. v. Concentra Integrated Servs., Inc.*, 697 F.3d 248, 254 (5th Cir. 2012) (making the same distinction under Louisiana law).[5] To determine whether an insurer owes a duty to defend, we apply the so-called "eight corners rule," meaning that we decide the issue based solely on the terms of the insurance policy and the allegations in the pleadings. *Nat'l Cas. Co. v. W. World Ins. Co.*, 669 F.3d 608, 612 (5th Cir. 2012); *see also Yount v. Maisano*, 627 So. 2d 148, 153 (La. 1993). Conversely, we generally evaluate the insurer's duty to indemnify after the parties have developed the actual facts that establish liability in the underlying lawsuit. *Columbia Cas. Co. v. Ga. & Fla. RailNet, Inc.*, 542 F.3d 106, 110–11 (5th Cir. 2008). Lexington here raises an exception, in which a reviewing court may decide the insurer's duty to indemnify before the conclusion of the underlying litigation if "the insurer has

claim remains pending, Lexington contends that the district court can consider the duty to indemnify before the underlying tort litigation concludes if "the insurer has no duty to defend *and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify.*" *Id.* We have held that a district court may rule on the duty to indemnify in a declaratory judgment action like this one before the resolution of the underlying tort suit when an exception to the general rule, such as the *Griffin* exception at issue here, applies. *See Columbia Cas. Co. v. Ga. & Fla. RailNet, Inc.*, 542 F.3d 106, 110–12 (5th Cir. 2008); *see also Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 368–69 (5th Cir. 1998). Additionally, both policies are ripe for review because the Plaintiffs have already obtained a $2.25 million verdict, and they are now pursuing additional civil rights damages on the same facts under a new theory of liability. *See Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 897 (5th Cir. 2000) (recognizing that even the *threat* of litigation, if sufficiently concrete, can establish an actual controversy for purposes of a declaratory judgment action).

[5] The district court recognized, but did not decide, a choice of law issue. The parties cite authority from both Texas and Louisiana in support of their respective positions. But, like the district court, we do not decide the choice of law issue because the parties have not briefed or presented argument on this issue, and we discern no substantive differences in the relevant insurance laws of the two states.

no duty to defend and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify." *Farmers Tex. Cty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997) (per curiam) (emphasis omitted).

As we have earlier indicated, we focus on exclusions in each of the policies—first on the medical services exclusion in the CGL policy and, second, on the professional liability exclusion in the CUL policy.[6]  We recognize that insurance terms, particularly exclusions, are strictly construed against the insurer, and, as appropriate, in favor of the insured.  *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991); *Garcia v. St. Bernard Parish Sch. Bd.*, 576 So. 2d 975, 976 (La. 1991).  Because this case is before this Court on cross-motions for summary judgment, we review the district court's rulings de novo and construe all evidence and inferences in favor of the non-moving parties.  *McCorkle v. Metro. Life Ins. Co.*, 757 F.3d 452, 456 (5th Cir. 2014).

## III.

## A.

We will first discuss the CGL policy, under which the district court held that Lexington had a duty to defend Garcia's claims against LCS.  In this respect, we will initially consider whether Lexington must provide a defense to LCS.  We will later turn our attention to the duty to indemnify.

---

[6] Lexington also argues that the facts in the underlying Garcia litigation do not satisfy the "occurrence" requirement in the insurance agreements in the CGL and CUL policies. Because we hold that the exclusions in this case exclude coverage, we need not decide whether the Plaintiffs' Complaint alleged facts that would give rise to an "occurrence" under the insurance agreements.

No. 14-40494 cons/w No. 14-40587

1.

a.

At the outset, LCS and the Plaintiffs contend that we need not even consider the medical services exclusion because the civil rights endorsement in the CGL policy overrides the medical services exclusion, which is to say, that the civil rights endorsement stands on its own and is not subject to the medical services exclusion of the primary policy.  The civil rights endorsement provides as follows:

> This insurance applies to claims or "suits" arising out of "bodily injury" and "property damage" caused by alleged civil rights violations, so long as such violations and any resulting injury(ies) are not expected or intended from the standpoint of the insured or any person or organization either representing or acting on behalf of the insured.[]
>
> *All other terms and conditions of the policy remain the same.*

(Emphasis added.)

We cannot agree that the civil rights endorsement overrides the medical services exclusion.  The civil rights endorsement, by its terms, is only a modifier of the insurance agreement itself.  Consequently, the endorsement is subject to, and governed by, all other relevant terms of the primary insurance agreement, to which it is attached, unless otherwise stated.  This means that it is subject to the exclusions in the policy, including the medical services exclusion. *See Michelet v. Scheuring Sec. Servs. Inc.*, 95-2196, p. 12–13 (La. App. 4 Cir. 9/4/96); 680 So. 2d 140, 147–48 (holding that an assault and battery endorsement expanded the definition of an "occurrence" under the insurance policy but that claims under the endorsement were still subject to exclusion if those claims involved criminal acts within a policy exclusion).  Indeed, our holding in this respect is "endorsed" by the language of the civil rights

endorsement itself, which states that "[a]ll other terms and conditions of the policy remain the same."

In sum, our review of the policy leads to the conclusion that the medical services exclusion applies to the Plaintiffs' claim *if* the allegations in the Complaint fall within the medical services exclusion, which we now turn to address.[7]

b.

The medical services exclusion provides as follows:

> In consideration of the premium charged, it is agreed that this policy shall not apply to any liability of the Insured arising out of the rendering or failure to render "Medical Services" by any employee of the Insured or any independent contractor who has entered into a contractual agreement with the Insured.

> For the purposes of this endorsement, "Medical Services" shall mean:

> a) medical, surgical, dental or nursing treatment to such person or the person inflicting the injury including the furnishing of food or beverages in connection therewith;

> b) furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances if the injury occurs after the Named Insured has relinquished possession thereof to others;

> c) handling of or performing post-mortem examination on human bodies; or

> d) service by any person as a member of a formal accreditation or similar professional board or committee of the Named Insured, or as a person charged with the duty of executing directives of any such board or committee.

---

[7] We also reject the argument that applying the medical services exclusion to civil rights claims renders the civil rights endorsement meaningless. There is no doubt that the medical services exclusion potentially excludes some civil rights claims. But there are also many civil rights violations to which the medical services exclusion would have no relevance.

The parties dispute whether this case is controlled by subpart (a) or subpart (b) of the medical services exclusion. According to LCS and the Plaintiffs, only subpart (b) is relevant; only it addresses the dispensation of medication. They further argue that because all parties agree that subpart (b) does *not*, itself, exclude coverage in this case, *a fortiori*, coverage of the § 1983 claim exists under the CGL policy. But Lexington says, not so fast; there is more to the definition of "medical services" than subpart (b); subpart (a) broadly excludes "medical, surgical, dental or nursing treatment." As applied to the facts in this case, subpart (a) excludes coverage of the denial of medication to Garcia.

We believe that Lexington is correct: because the exclusions are listed in the disjunctive, we must consider subpart (a) of the medical services exclusion as distinct from subpart (b). The inclusion of "or" after subpart (c) demonstrates that the exclusion is written in the disjunctive, and each subpart must be considered separately. *See, e.g., PPG Indus., Inc. v. Shell Oil Co.*, 727 F. Supp. 285, 287 (E.D. La. 1989) ("[U]nder the law of Texas, contract language should be given its 'plain grammatical meaning.' Simply stated, 'or' is disjunctive, or alternative in its effect." (quoting *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985))). Consequently, a reviewing court must review *each* of the four definitions separately in order to determine whether the allegations in a particular suit fall within *any* of the four exceptions. For example, subpart (b) applies to preclude coverage in a situation where the insured has given drugs or other medical equipment to a third party, such as a contractor (or even potentially an inmate). By contrast, subpart (a) applies when LCS *directly* provides or fails to provide medical care. Because subparts (a) and (b) address different situations and do not conflict, the provisions should be read in harmony to give effect to each. *See Weeks Marine, Inc.*, 737 F.3d at 369 ("Texas courts examine the entire contract in an effort to

harmonize and give effect to all provisions so that none is rendered meaningless."). Thus, we conclude that Lexington is not required to defend LCS if the allegations in the Plaintiffs' Complaint fall within the meaning of subpart (a) of the medical services exclusion.

c.

So now we move on to consider whether the Plaintiffs' allegations fall within subpart (a) of the exclusion. Relevant here, the medical services exclusion denies coverage of "*any* liability of the Insured *arising out of* the . . . failure to render 'Medical Services.'" (Emphasis added.) Thus, we ask whether the Plaintiffs' alleged injury relates to the failure to render "Medical Services," which services are defined as "medical, surgical, dental or nursing treatment."

In essence, the Plaintiffs allege that Garcia died when the staff at the Detention Center failed to provide him with his prescribed benzodiazepines. When speaking generally, administering medication to an individual or to a group of people is certainly a form of "medical treatment." *See Duncanville Diagnostic Ctr., Inc. v. Atl. Lloyd's Ins. Co. of Tex.*, 875 S.W.2d 788, 791 (Tex. App. 1994) ("Administering drugs as well as providing medical advice or making a medical diagnosis requires the exercise of trained medical judgment.").

Although the Plaintiffs and LCS argue that Garcia died as a result of LCS's adhering to its administrative policy, and not from a failure to render medical services, this distinction proves unavailing here. In a closely similar comparison, as discussed in more detail *infra*, we have "distinguished between 'professional' tasks and 'administrative' tasks." *Nat'l Cas. Co.*, 669 F.3d at 615. Garcia's death, however, was caused by the failure to provide benzodiazepines to him, in other words, a failure to render a professional service. It may be true that no professional decision was made in denying the medicine. But providing and administering medicine to an inmate in a prison is a medical

service, which LCS failed to render, for whatever reasons. *See Allstate Ins. Co. v. Disability Servs. of the Sw., Inc.*, 400 F.3d 260, 265 (5th Cir. 2005) (concluding that a medical services exclusion applied to a quadriplegic plaintiff's claims of inadequate medical treatment, which stemmed in part from his lack of access to a telephone to inform medical personnel of his injuries, because "the claim that [the patient's] death was caused by the failure to provide communication devices is inseparable from the [plaintiffs'] claim that [the defendant] failed to provide adequate medical care, and the medical services exclusion applies"). Consequently, Lexington owes no duty to defend LCS under the CGL policy, we VACATE the district court's ruling in this respect, and REMAND the case for entry of judgment in Lexington's favor on this issue.[8]

2.

Having decided that Lexington owes no duty to defend, we must also briefly consider whether Lexington owes a duty to indemnify LCS under the CGL policy for any liability on the Plaintiffs' § 1983 claim. Although a court must generally decide whether an insurer has a duty to indemnify at the conclusion of litigation, it may decide the issue earlier when it is clear that the court's ruling on the duty to defend must also control the duty to indemnify. *Griffin*, 955 S.W.2d at 84. In the context of this case, it follows that there is no duty to indemnify for the same reasons that we concluded there is no duty to defend—the medical services exclusion plainly excludes from coverage any

---

[8] The parties also point to various allegations of negligence in the Complaint, and LCS points to a negligent act endorsement in the CGL policy, which applies to negligent acts, including "errors or omissions arising out of the insured's rendering or failure to render professional services." The parties have already tried the negligence issues before a jury, though, and neither LCS nor the Plaintiffs seek a review of Lexington's duties relating to *that* litigation. Instead, we construe this action to relate only to the § 1983 claim, which cannot be based upon mere negligence. *See, e.g., Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999). Thus, Lexington's obligation as to the negligence claims is not before us.

No. 14-40494 cons/w No. 14-40587

liability that is based on the failure of LCS to render medical services, including the failure to provide medications, to inmates. To the extent that the district court declined to reach this duty, we VACATE its ruling, and REMAND the case for entry of judgment in Lexington's favor on this issue.

B.

As we said at the outset of this opinion, there are two policies involved. Having concluded that Lexington owes no duty to defend or indemnify under the CGL policy, we must next decide whether Lexington owes a duty to defend or indemnify LCS under the CUL policy.

Thus, in considering the CUL policy, we focus on the professional liability exclusion, which provides as follows:

> It is agreed that this policy shall not apply to liability arising out of the rendering of or failure to render professional services, or any error or omission, malpractice or mistake of a professional nature committed by or on behalf of the "Insured" in the conduct of any of the "Insured's" business activities.

Because the term "professional service" is not defined by the contract, we look to the general definition of such services:

> [T]he task must arise out of acts particular to the individual's specialized vocation, [and] . . . it must be necessary for the professional to use his specialized knowledge or training.

*Admiral Ins. Co. v. Ford*, 607 F.3d 420, 423 (5th Cir. 2010) (alterations in the original) (quoting *Atl. Lloyd's Ins. Co. of Tex. v. Susman Godfrey, L.L.P.*, 982 S.W.2d 472, 476–77 (Tex. App. 1998)). Here, the parties do not dispute the basic interpretation of the policy terms. Instead, the parties direct their arguments to whether the allegations in the Complaint arise out of professional or non-professional services.

12

No. 14-40494 cons/w No. 14-40587

1.

As with the medical services exclusion above, the application of the professional liability exclusion in the CUL policy turns on whether the Plaintiffs have adequately alleged that a separate administrative policy—not the denial of "professional services"—caused Garcia's death.  In the context of a professional services exclusion, we have recognized that "[o]ur precedent has distinguished between 'professional' tasks and 'administrative' tasks."  *Nat'l Cas. Co.*, 669 F.3d at 615.  According to the Plaintiffs and LCS, Garcia died because LCS had followed and applied a company policy "administered by non-medical and non-professional management personnel . . . , not to give inmates scheduled medications such as those prescribed to Garcia."

The dispositive inquiry here is whether providing medications to inmates in a prison is a professional medical service.  *Duncanville Diagnostic Ctr., Inc.*, 875 S.W.2d at 791 ("Administering drugs as well as providing medical advice or making a medical diagnosis requires the exercise of trained medical judgment.  These acts also demand the application of specialized education and knowledge.").  Indeed, LCS and the Plaintiffs do not contest that distributing medications to inmates in a prison is a service that requires professional training, care, and judgment.  Instead, they argue that administrative personnel at LCS adopted a policy of refusing to provide certain medications to inmates and that the development of *this policy* did not require the exercise of professional skill or judgment.  To the contrary, LCS and the Plaintiffs argue that LCS adopted the policy for business reasons.

LCS and the Plaintiffs have sliced this issue too thin, however, by arguing that a separate administrative policy actually *caused* the injury, i.e., the liability, in this case.  Admittedly, our cases have held that an administrative action is not excluded from coverage by a professional services exclusion when the administrative action itself causes an injury separate from

No. 14-40494 cons/w No. 14-40587

any injury caused by the professional service.  *See, e.g.*, *Willbros RPI, Inc. v. Cont'l Cas. Co.*, 601 F.3d 306, 310–12 (5th Cir. 2010) (recognizing that conduct falls outside a professional services exclusion if the conduct "provides an independent but for cause of the injury"); *Guar. Nat'l Ins. Co. v. N. River Ins. Co.*, 909 F.2d 133, 136–37 (5th Cir. 1990) (concluding that a hospital's failure to maintain adequate security regarding its windows did not fall within a professional services exclusion).  In contrast to these cases, the Plaintiffs here have alleged only a *failure* on the part of LCS to provide a *professional service*, i.e., the distribution of medication, to Garcia.  Even if the policy were adopted for administrative reasons, the effect of the policy is that LCS failed to provide a professional service to an inmate, which is alleged to have caused Garcia's death.  *Cf. Nat'l Cas. Co.*, 669 F.3d at 611, 615–16 (concluding that potential liability regarding the dispatch of emergency personnel to an accident scene could fall outside a professional liability exclusion when the emergency personnel allegedly failed to use proper care in loading an individual into an ambulance).  The questions are whether the subject injury was caused by particular conduct of the insured, and whether such conduct falls inside or outside the definition of professional services.  A policy itself is not conduct.  Furthermore, that LCS personnel may not have made a professional *decision* in adopting its administrative policies does not address the coverage question.  The policy excludes a professional "service"; LCS failed to provide a professional service by not providing medications to inmates, and thus comes within the specified conduct excluded from coverage.

The provisions of the professional liability exclusion further support our interpretation of this provision.  The exclusion applies to: (1) liability arising out of the *rendering* of professional services; (2) liability arising out of the *failure* to render professional services; and (3) liability arising out of omissions, malpractice, and mistakes "of a professional nature."  The first provision

14

applies when LCS, the insured, incurs liability from professional services inadequately rendered; that is, because of some professional or non-professional decision, inmates *receive* medical services that are inadequate. Similarly, the third provision excludes from coverage injuries that occur when a *professional* commits malpractice on an inmate. The second provision, which is applicable here, applies more broadly to a situation in which LCS, the insured, fails to provide a professional service to inmates *at all*. Here, the Plaintiffs have alleged that LCS, the insured, prohibited its medical personnel from distributing certain medications to inmates. Under the terms of the professional liability exclusion, the liability in this case arises out of LCS's *failure* to render professional services to Garcia. Thus, Lexington owes no duty to defend LCS under the CUL policy, and accordingly, we AFFIRM the judgment of the district court in this respect.

2.

Finally, we conclude that there is no duty to indemnify LCS with respect to the CUL policy. As we explained with regard to the CGL policy, a reviewing court may determine the duty to indemnify before the conclusion of the underlying litigation "when the insurer has no duty to defend and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify." *Griffin*, 955 S.W.2d at 84 (emphasis omitted). The district court concluded that "no facts can be developed in the Garcia Lawsuit that can transform the failure to administer medication into an administrative policy unrelated to the failure to render professional medical services." Based on our review of the record, we agree. As we have said, any administrative policy plainly amounted to a refusal to render a professional service to Garcia.

Thus, we AFFIRM the district court's rulings addressing the CUL policy.

No. 14-40494 cons/w No. 14-40587

IV.

In sum, our review of the CGL and CUL policies leads us to conclude that the § 1983 claim is excluded from coverage by both policies.  Accordingly, we hold that Lexington owes no duty to defend or indemnify LCS under the CGL policy; and we also hold that Lexington owes no duty to defend or indemnify LCS under the CUL policy.  We further hold that the district court did not err in granting summary judgment for Lexington under the CUL policy, and thus AFFIRM the judgment in this respect.  Finally, we hold that the district court erred in its judgment with respect to the CGL policy, and we REMAND the case for entry of judgment in favor of Lexington.

AFFIRMED in part, VACATED in part, and REMANDED,
for entry of judgment consistent with this opinion.

16