**COLONY INSURANCE COMPANY**

v.

**CUSTOM AG COMMODITIES, LLC,**
**Diversified Ingredients, Inc.**

**Civil Action No. 4:16–CV–83**

United States District Court,
E.D. Texas, Sherman Division.

Signed July 10, 2017

---

**356.**   Rec. Doc. 50–1 at 23.

**357.**   *Id.* at 24.

**358.**   Rec. Doc. 2 at 3.

**359.**   *Id.*

**360.**   *Id.* at 2.

**361.**   Rec. Docs. 1–1, 1–2.

**362.**   Rec. Doc. 50.

Stephen Andrew Melendi, John Charles Tollefson, Tollefson Bradley Mitchell & Melendi LLP, Dallas, TX, for Colony Insurance Company.

Charles William Fillmore, Hartson Dustin Fillmore, III, The Fillmore Law Firm, LLP, Fort Worth, TX, Howard Jay Klatsky, Michael Paul Sharp, Timothy Russell George, Fee Smith Sharp & Vitullo, LLP, Dallas, TX, for Custom Ag Commodities, LLC, Diversified Ingredients, Inc.

## MEMORANDUM ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

AMOS L. MAZZANT, UNITED STATES DISTRICT JUDGE

Came on for consideration the reports of the United States Magistrate Judge in this action, this matter having been heretofore referred to the Magistrate Judge pursuant to 28 U.S.C. § 636. On June 15, 2017, the report of the Magistrate Judge (Dkt. # 44) was entered containing proposed findings of fact and recommendations that Plaintiff Colony Insurance Company's Motion for Summary Judgment (Dkt. # 32) be granted, and that Defendant Diversified Ingredients, Inc.'s Cross Motion for Summary Judgment (Dkt. # 34) and Defendant Custom Ag Commodities, LLC's Cross Motion for Summary Judgment (Dkt. # 36) each be denied.

Having received the reports of the Magistrate Judge, and no objections thereto having been timely filed, the Court is of the opinion that the findings and conclusions of the Magistrate Judge are correct and adopts the Magistrate Judge's report as the findings and conclusions of the Court.

It is, therefore, **ORDERED** that Defendant Diversified Ingredients, Inc.'s Cross Motion for Summary Judgment (Dkt. # 34) and Defendant Custom Ag Commodities, LLC's Cross Motion for Summary Judgment (Dkt. # 36) each are **DENIED.**

It is further **ORDERED** that Plaintiff Colony Insurance Company's Motion for Summary Judgment (Dkt. # 32) is **GRANTED.**

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Christine A. Nowak, UNITED STATES MAGISTRATE JUDGE

Pending before the Court are Plaintiff Colony Insurance Company's Motion for Summary Judgment and Brief in Support ("Colony Motion for Summary Judgment") [Dkt. 32], Defendant Diversified Ingredients, Inc.'s Cross Motion for Summary Judgment ("Diversified Motion for Summary Judgment") [Dkt. 34], and Defendant Custom Ag Commodities, LLC's Cross Motion for Summary Judgment ("Custom Ag Motion for Summary Judgment") [Dkt. 36]. After reviewing the Motions, Responses [Dkts. 37–38; 41], Replies [Dkts. 42–43], and all other relevant filings,[1] the Court recommends that Colony's Motion for Summary Judgment be **GRANTED**, and the cross-motions filed by Diversified and Custom Ag be **DENIED.**

## BACKGROUND

The above-captioned lawsuit arises from an insurance coverage dispute. In May of 2014, Nestle Purina PetCare Company ("Purina") filed a false advertising lawsuit against The Blue Buffalo Company Ltd. ("Blue Buffalo") in the United States District Court for the Eastern District of Missouri, 4:14–CV–00859–RWS. Purina's complaint alleges that, directly contrary to the "True Blue Promise" touted in Blue Buffalo's advertising, Blue Buffalo products contain substantial proportions of chicken/poultry by-product meal, along with corn and artificial preservatives. Purina alleges Blue Buffalo's use of by-product meal dates back to at least 2009 and is directly contrary to Blue Buffalo's product labels; Purina also asserts that Blue Buffalo's advertising campaign related to such products dates back to 2013 [Dkt. 34–1 at pg. 9].[2] Purina alleges "Blue Buffalo heaped praise upon its own products because they did not contain any chicken/poultry by-product meal—in contrast to 'big name' pet foods," but these commercials were false, deceptive, wholly unsubstantiated and fully intended to injure Purina's reputation [Dkt. 34–1 at pg. 6, 16]. Purina's complaint demands recovery for false advertising and commercial disparagement under the Lanham Act, 15 U.S.C. § 1125(a), along with state statutory and common law claims for deceptive trade practices, injurious falsehood, unfair competition, and unjust enrichment [Dkt. 34–1 at pg. 42–49].

In addition to the Purina lawsuit, Blue Buffalo faces class action litigation filed by consumers in the United States District Court for the Eastern District of Missouri, 14–MD–02562–RWS. For the purposes of the insurance coverage action filed in this forum, the consumer class action litigation raises essentially the same false advertising allegations as the lawsuit filed by Purina [Dkt. 34–2].

---

1. The Court notes that Dkt. Nos. 34 and 37 are identical; Dkt. Nos. 36 and 38 are also identical. Moreover, Dkt. Nos. 36 and 38, in all materials respects, raise the same arguments, verbatim, as Dkt. Nos. 34 and 37. Docket filings 42 and 43 are likewise identical to each other. As a result, the same evidence was repeatedly filed by the Parties. The Court has reviewed and considered all filings; it notes, however, that after eliminating all the duplication, Dkt. Nos. 32, 34, 41, and 42 raise the arguments the Court must address, with Dkt. Nos. 32–1 through 32–3, 34–1 through 34–4, and 41–1 providing the supporting evidence for those arguments.

2. CMECF Headers were not affixed to the Exhibits to Dkt. No. 34; accordingly, all references to page numbers for the Exhibits to Dkt. No. 34 are to those found at the bottom of the page within such Exhibits.

Blue Buffalo filed a third-party complaint against Wilbur–Ellis Company ("Wilbur–Ellis") and Diversified [Dkt. 41–1]. Diversified was Blue Buffalo's ingredient broker for product supplies, and Wilbur–Ellis owned a plant, the Rosser facility, from which Diversified purchased chicken meal for Blue Buffalo's products [Dkt. 32–2 at 4; 32–3 at 4]. Blue Buffalo's third-party complaint alleges Wilbur–Ellis and Diversified provided written guarantees to Blue Buffalo that the chicken and turkey meal that they were providing "exclu[ded] ... feathers, heads, feet, and entrails," except in unavoidable trace amounts, but that they violated these contracts many times over the course of several years and concealed such violations from Blue Buffalo [Dkt. 41–1 at 3]. Blue Buffalo alleges damages arising from paying for a superior product while receiving an inferior one. Blue Buffalo also alleges the conduct of Wilbur–Ellis and Diversified harmed Blue Buffalo's reputation and caused Blue Buffalo to incur significant attorney fees and expenses in the litigation brought by Purina, as well as the consumer class. Finally, Blue Buffalo seeks indemnification and contribution, arguing Wilbur–Ellis and Diversified should be ordered to pay all (or their pro rata share of any) amounts Blue Buffalo must pay Purina or the consumer class in the Missouri lawsuits [Dkt.41–1 at 4].

Diversified filed a crossclaim against Wilbur–Ellis and a third-party claim against Custom Ag in both of the Missouri lawsuits [Dkt. 32–2; 32–3]. Diversified alleges it contracted with Wilbur–Ellis and Custom Ag to supply chicken meal, unadulterated with feathers or beaks, but that Wilbur–Ellis and Custom Ag supplied chicken by-product instead and without Diversified's knowledge [Dkt. 32–2 at 4; 32–3

at 4]. Diversified alleges that from 2011 through mid–2014, Custom Ag and Wilbur–Ellis sold "Adulterated Meal" to Diversified [Dkts. 32–3 at 4; 34–4 at pg. 11]; that Wilbur–Ellis and Custom Ag labeled the product sold "as 'chicken meal' or 'chicken meal blend,'" but that it actually "contained no 'chicken meal' at all. Instead, the goods were comprised entirely of by-product meal, feather meal, and other products" [Dkts. 32–2 at 5; 34–3 at pg. 29]. Diversified specifically alleges:

> Defendants sold to Diversified the Adulterated Meal as high-quality and single ingredient chicken meal or turkey meal for four years in knowing violation of agreed-upon product specifications and labeling laws. Defendants never disclosed to Diversified all the actual ingredients in the goods Diversified purchased from Defendants until May 2014.

[Dkt. 32–2 at 13]. Diversified seeks contribution from Custom Ag for all or a proportional part of any damages owed to Blue Buffalo that were caused by Custom Ag's alleged wrongful conduct [Dkts. 32–2 at 14; 32–3 at 5; 34–3 at pg. 57–58; 34–4 at pg. 14–15].

As to the claims alleged in the Missouri lawsuits, Custom Ag has demanded representation and coverage from Colony, its commercial liability insurer. Colony issued a Commercial General Liability policy to Custom Ag beginning on April 20, 2012, with the policy renewed annually each of the next three years. The initial and three renewal policies provide identical coverage, with such coverage ending on April 20, 2016 [Dkt. 32–1]. Relevant herein, Coverage B of the policy provides "Personal and Advertising Injury Liability" coverage subject to several exclusions.[3] Coverage B states:

**3.** Colony's motion argues that coverage is not available under either Coverage A or Coverage B. Neither Diversified nor Custom Ag argue that coverage is available under Cover-

1. Insuring Agreement

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

. . . .

   b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

[Dkt. 32–1 at 7]. As used in the Policy, "Personal and advertising injury" is defined as "injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement."

[Dkt. 32–1 at 12].

Colony further argues that, even assuming the claims against Custom Ag could be construed as "personal and advertising injury," Custom Ag is not entitled to coverage under the following policy exclusions:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement."

[Dkt. 32–1 at 8].

Citing the language of the Policy, Colony seeks a judgment declaring it has no duty to defend and/or indemnify Custom Ag in the Missouri lawsuits. Custom Ag and Diversified seek a judgment stating Colony has a duty to defend Custom Ag.

age A [Dkts. 37–38]. As such, only Coverage B is at issue and discussed in this Report and

Recommendation.

Custom Ag and Diversified further assert that any decision on the duty to indemnify should be made after the Missouri lawsuits are resolved or, in the alternative, the Court should order Colony to pay any amounts Custom Ag may be required to pay to Diversified as a result of the Missouri litigation.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247, 106 S.Ct. 2505. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Up-*

*john Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. And the Court need only consider the record materials actually cited by the parties, though the Court may consider the entire record. FED. R. CIV. P. 56(c)(3).

## ANALYSIS

■■■ Under Texas law, the interpretation of an insurance policy is a matter of law for the Court to determine. *Regency Title Co., LLC v. Westchester Fire Ins. Co.*, 5 F.Supp.3d 836 (E.D. Tex. 2013); *Lubbock Cty. Hosp. Dist. v. Nat'l Union Fire Ins. Co.*, 143 F.3d 239, 241–42 (5th Cir. 1998). Interpretation of insurance contracts in Texas is governed by the same rules as interpretation of other contracts. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). Each insurance policy must be interpreted according to its own specific provisions and coverages. *Gilbert Tex. Constr. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 129 n.7 (Tex. 2010).

■■■ In determining the scope of coverage, a court examines the policy as a whole to ascertain the true intent of the parties. *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 202 (Tex.

2004). The court must also read all parts of the policy together in order to give meaning to every sentence, clause, and word to avoid rendering part of the policy inoperative. *Citigroup Inc. v. Fed. Ins. Co.*, 649 F.3d 367, 372 (5th Cir. 2011); *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995); *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998). A policy's terms must be given their ordinary and generally accepted meaning unless the policy shows the words were meant in a technical or different sense. *Nat'l Union Fire Ins. Co. v. McMurray*, 342 Fed.Appx. 956, 958 (5th Cir. 2009). When an insurance policy defines its terms, those definitions control. *Gastar Expl. Ltd. v. U.S. Specialty Ins. Co.*, 412 S.W.3d 577, 583 (Tex. App.–Houston [14th Dist.] 2013, pet. denied); *Gilbert Tex. Constr.*, 327 S.W.3d at 126. If a policy can be given only one reasonable meaning, it is not ambiguous and will be enforced as written. *Evergreen Nat'l Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 676 (Tex. App.–Austin 2003, no pet.); *State Farm Fire & Cas. Co. v. Vaughan*, 968 S.W.2d 931, 933 (Tex. 1998); *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Only the terms of the contract should be consulted when interpreting an unambiguous contract provision. *See Brown v. Palatine Ins. Co.*, 89 Tex. 590, 35 S.W. 1060, 1061 (1896); *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010).

▇▇▇▇ Texas law is clear that "the parties' intent must be taken from the contract itself, not from the parties' present interpretation, and the contract must be enforced as written." *Nicholas Petroleum, Inc. v. Mid–Continent Cas. Co.*, No. 05-13-01106-CV, 2015 WL 4456185, at *5 (Tex. App.–Dallas July 21, 2015, no pet.); *see also Lewis v. Foxworth*, 170 S.W.3d 900, 903 (Tex. App.–Dallas 2005, no pet.).

Moreover, a court "may neither rewrite the contract nor add to its language." *Schaefer*, 124 S.W.3d at 162; *see also Nicholas Petroleum*, 2015 WL 4456185, at *5; *Calpine Producer Servs., L.P. v. Wiser Oil Co.*, 169 S.W.3d 783, 787 (Tex. App.–Dallas 2005, no pet.).

▇▇▇▇ "The duty to defend means the insurer will defend the insured in any lawsuit that alleges and seeks damages for an event potentially covered by the policy." *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252–53 (5th Cir. 2011). An insurer owes its insured a duty to defend "if a plaintiff's factual allegations potentially support a covered claim." *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 490 (Tex. 2008) (citing *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 310 (Tex. 2006)). Whether the insurer owes a duty to defend is a question of law for the court to decide. *Ooida Risk Retention Grp., Inc. v. Williams*, 579 F.3d 469, 471–72 (5th Cir. 2009). When faced with a coverage dispute, the court must give effect to the intention of the parties as that intention is expressed in the insurance policy itself. *See Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex. 1983).

▇▇▇▇ In deciding whether an insurer has a duty to defend, the Court must follow the "eight-corners rule"—that is, the duty to defend is determined by considering only the plaintiff's pleadings in the underlying lawsuit and the policy language. *Zurich*, 268 S.W.3d at 491. The focus is on the factual allegations in the underlying complaint, not on the legal theories. *See id.* at 495 (citing *Farmers Tex. Cty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997)). The court is required to "resolve all doubts regarding the duty to defend in favor of the duty" and to "construe the pleadings liberally." *Id.* at 491; *see also Gehan Homes Ltd. v. Emp'rs*

*Mut. Cas. Co.*, 146 S.W.3d 833, 838 (Tex. App.–Dallas 2004, pet. denied) ("[W]e give the allegations in the petition a liberal interpretation in favor of the insured."); *Lipscomb Ins. Grp. v. Hartford Lloyd's Ins. Co.*, No. 3:09-cv-2047-O, 2010 WL 11475236, at *3, *8 (N.D. Tex. Nov. 29, 2010) (noting " '[a]llegations are read liberally' in favor of coverage and the Court " 'may draw inferences from the petition that may lead to a finding of coverage' " " and finding duty to defend) (quoting *Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 368 (5th Cir. 2008), in turn quoting *GuideOne Elite Ins. Co.*, 197 S.W.3d 305, 307 (Tex. 2006)); *Mt. Hawley Ins. Co. v. Steve Roberts Custom Builders, Inc.*, 215 F.Supp.2d 783, 787 (E.D. Tex. 2002) (Brown, J.) (noting that "[d]oubts as to whether or not the factual allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, ... will be resolved in the insured's favor" and finding insurer had duty to defend (modifications and internal quotations omitted)). "If a complaint potentially includes a covered claim, the insurer must defend the entire suit." *Zurich*, 268 S.W.3d at 491. Further, courts consider only the most recently amended complaint in making the determination whether the insurer has a duty to defend. *See, e.g., Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 528 (5th Cir. 2004) ("The duty to defend is determined by consulting the latest amended pleading."); *Evanston Ins. Co. v. McChristian*, 561 F.Supp.2d 683 (E.D. Tex. 2007) (Under Texas law, "the duty to defend is determined by looking to the latest, and only the latest, amended pleadings.").

▮ In contrast to the duty to defend, the court generally evaluates the insurer's duty to indemnify "after the parties have developed the actual facts that establish liability in the underlying lawsuit." *LCS Corr. Servs., Inc. v. Lexington Ins., Co.*, 800 F.3d 664, 668 (5th Cir. 2015). But the court "may decide the insurer's duty to indemnify before the conclusion of the underlying litigation if 'the insurer has no duty to defend and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify.' " *LCS Corr. Servs., Inc.*, 800 F.3d at 669 (quoting *Griffin*, 955 S.W.2d at 84 (Tex. 1997)).

▮ The insured bears the burden of showing that the claim against it is potentially within the policy's affirmative grant of coverage. *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 552–53 (5th Cir. 2004); *N.Y. Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996). If the insurer relies on the policy's exclusions to deny coverage, the burden shifts to the insurer to prove the exclusion applies. *Primrose*, 382 F.3d at 553; *N.H. Ins. Co. v. Martech USA, Inc.*, 993 F.2d 1195, 1199 (5th Cir. 1993). If the insurer is successful, the burden shifts back to the insured to show that an exception to the exclusion brings the claim potentially within the scope of coverage under the insurance policy. *Primrose*, 382 F.3d at 553.

## I. DETERMINATION OF THE RELEVANT PLEADINGS

▮ Before turning to consider either the duty to defend or indemnify, the Court must determine which pleadings are relevant to the instant coverage dispute (i.e., when an insured is sued under a CGL policy for contribution or indemnification). Colony argues the Court should review only Diversified's third-party complaint against Colony's insured, Custom Ag [Dkt. 41 at 11]. Diversified and Custom Ag argue, conversely, that the Court must also consider the initial complaint which

prompted the complaints for contribution and indemnification; specifically, the complaints filed by Purina and by the consumer class against Blue Buffalo [Dkts. 34 at pg. 14; 43 at 4]. In the alternative, Diversified and Custom Ag argue that, since the complaints against Blue Buffalo are "incorporated by reference" into the third party complaints for indemnification and contribution, the Court must consider the allegations within the complaints against Blue Buffalo when assessing the issue of coverage.

Diversified and Custom Ag have not cited, and the Court has not found, any case law supporting their argument that pleadings other than those against the insured (here Custom Ag) are relevant in determining the coverage issue. To the contrary, "it is the factual background alleged in the third-party complaints that provides the pertinent frame of reference with regard to the issue of coverage," and not the allegations within the complaints against Blue Buffalo. *Gibson & Assocs., Inc. v. Home Ins. Co.*, 966 F.Supp. 468, 473 (N.D. Tex. 1997). Consider in *Gibson*, business owners filed a negligence claim against the City of Dallas for financial losses arising from a construction-related street closing. The City, in turn, filed a third-party breach of contract action against the street contractor, seeking indemnification and contribution. The contractor sought coverage under its CGL policy, arguing it was entitled to coverage since negligence claims were raised against the City. Rejecting this argument, the *Gibson* court held that the coverage issue is determined by reviewing the City's third-party action against the contractor, not the business owners' claims against the City. And the mere fact of incorporation did not demonstrate that the business owners' claims against the City were adopted by the City as its claims against the contractor and/or that the City was seeking recovery from

the contractor on the same legal theories raised against the City. *Gibson*, 966 F.Supp. at 473. *Gibson* thus concluded that, while the business owners' negligence claims may not have been excluded under the contractor's CGL policy had the contractor been the named defendant, the Policy did not provide coverage for the City's breach of contract claims against the contractor for indemnification or contribution toward any amounts the City owed to the business owners. *Gibson* held the insurer was not obligated to defend those claims. *See also Huffhines v. State Farm Lloyds*, 167 S.W.3d 493, 497 (Tex. App.–Houston [14th Dist.] 2005) (holding insurer's duty to defend is based on the allegations contained in the Third Party Petition for contribution or indemnification and the language of appellants' insurance policies); *E & R Rubalcava Constr., Inc. v. Burlington Ins. Co.*, 148 F.Supp.2d 746 (N.D. Tex. 2001) (considering allegations within the third party petitions for indemnification when assessing the insurer's duty to defend and indemnify the third party defendant).

The Court finds that only the third party petition against Custom Ag is relevant in deciding whether Colony has a duty to defend and/or indemnify. A contrary ruling would expose the insurer to liability for claims and/or on theories beyond those directly involving its own insured; claims for which it received no premium and never agreed to cover. And while Diversified and Custom Ag argue that the allegations of the consumer class and Purina were incorporated by reference into the third party petitions against Diversified and Custom Ag, that incorporation merely provides context to the third party claims; it does not convert the false advertising claims against Blue Buffalo into a false advertising lawsuit against Custom Ag. Thus, when assessing the coverage issue,

and consistent with Texas's "eight-corners rule," the Court will consider only the third party petitions against Custom Ag and the language of the Policy issued to Custom Ag by Colony.

## II. DUTY TO DEFEND

### A. Custom Ag's Alleged Conduct

Diversified and Custom Ag argue Colony has a duty to defend under the Coverage B, "Personal and Advertising Injury" terms of the Policy [Dkt. 34 at pg. 11]. Specifically, they argue that any potential third party liability of Custom Ag would be for injuries "arising out of" an "[o]ral or written publication in any manner or material that slanders or libels a person's or organization's goods, products or services," [Dkts. 34 at pg. 11; 32–1 at 12 (paragraph 14(d) ], and that the claims alleged against Custom Ag are within the definition of "personal and advertising injury" covered under the Policy. Diversified and Custom Ag further assert that since Custom Ag may be liable for causing Blue Buffalo's alleged false advertising, the third party claims are for injuries "arising out of … in any manner" Custom Ag's conduct and are covered under the Policy [Dkt. 34 at 11–12, 24]. In connection with this assertion, Diversified and Custom Ag, note that unlike other subdivisions of the Policy's definition of "personal and advertising injury," paragraph 14(d) does not require the claims to arise out of "your" (Custom Ag's) slanderous or libelous statements. They argue "Colony intended to provide coverage to insureds such as Custom Ag who are caught up in litigation involving false advertising whether or not Custom Ag actually committed the advertising offense" [Dkt. 34 at pg. 11–12].

Colony argues the allegations against Custom Ag are not within the definition of the Policy's "personal and advertising injury," explaining:

The law requires more than an insured being "caught up in" litigation which includes some remote dispute between others in which one party has been sued for an act that might be covered if it were an insured. Only if Custom Ag itself did something wrong, something actionable, can any liability, whether for Diversified's own damages, or for Blue Buffalo's damages that Diversified seeks to pass through, be visited on Custom Ag. And only if the factual basis for that claim is within the insuring agreement can there be coverage. Here, that wrongful act was delivering goods that did not conform to its contract, which is not a covered offense.

[Dkt. 41 at 9].

The Court agrees with Colony and rejects the broad interpretation argued by Diversified and Custom Ag. As to Defendants' argument comparing paragraphs 14(f) and (g) with paragraph 14(d) of the Policy's Definitions (Section V), the word "your" in paragraphs 14(f) and 14(g) is not used to modify whose conduct is the cause of personal or advertising injury, but rather to clarify that coverage is available only if another's advertising idea, copyright, trade dress or slogan is used in "your" (Custom Ag's) advertisements. As such, and contrary to the arguments made by Diversified and Custom Ag, the absence of the word "your" in paragraph 14(d) does not distinguish that paragraph from paragraphs 14(f) and (g): Its omission does not permit an interpretation of 14(d) that extends coverage to disparaging conduct committed by persons or entities other than Custom Ag.

Rather, upon reading the Policy as a whole and interpreting it consistent with its intent as evidenced by the Policy language, as to all subparts of the "personal and advertising injury" definition within the Policy, the Court finds coverage is

provided only when Custom Ag, itself, performs the described conduct [Dkt. 32–1 at 12]. If the Court accepted the broad interpretation advanced by Diversified and Custom Ag, the actions of a third party to an insurance contract could modify the coverage available to Custom Ag, effectively, transforming the insured's uncovered conduct into covered conduct. "Colony would potentially have to pay Diversified for its exposure to Blue Buffalo for Blue Buffalo's [false advertising] campaign—in essence, making Colony the insurer for Blue Buffalo's acts, a risk for which it received no premium" [Dkt. 41 at 10–11].

The Court finds that under paragraph 14(d) of the Policy, coverage is available if Custom Ag publishes statements, in any manner, which slander or libel a person or organization, or disparage their goods, products or services. The third party petitions against Custom Ag for indemnification or contribution do not raise such allegations, and no other subparts within the definition of Coverage B "Personal and advertising injury" have been argued or apply to the claims against Custom Ag. Applying the eight-corners rule, Colony has no duty to defend under the Policy terms.

### B. The Fortuity Doctrine

■■■■ Assuming *arguendo* that the allegations against Custom Ag could give rise to a claim for personal and advertising injury under Coverage B, the Court further considers whether coverage is unavailable because Custom Ag's alleged conduct began before it obtained a CGL Policy from Colony. Under the fortuity doctrine, an insured cannot obtain coverage for something that has already begun and which is known (or should have been known) to have begun. *Summers v. Harris*, 573 F.2d 869, 872 (5th Cir. 1978). "Insurance is designed to protect against unknown, fortuitous risks, and fortuity is a requirement of all policies of insurance." *Warrantech Corp. v. Steadfast Ins. Co.*, 210 S.W.3d 760, 766 (Tex. App.–Fort Worth 2006, pet. denied).

■■■■ The fortuity doctrine precludes coverage for two categories of losses: known losses and losses in progress. A "known loss" is one the insured knew had occurred before the insured entered into the contract for insurance, while a "loss in progress" involves those situations in which the insured knows, or should know, of a loss that is ongoing when the policy is issued. *Warrantech Corp.*, 210 S.W.3d at 766.

Here, even assuming the Policy issued to Custom Ag provides coverage for Blue Buffalo's false advertising, the source of Custom Ag's liability—its alleged use of chicken by-products (chicken meal adulterated with feathers and beaks)—allegedly began in 2011 [Dkts. 32–3 at 4; 34–4 at pg. 11]. Colony first issued CGL insurance to Custom Ag in April of 2012, after Custom Ag allegedly began its ongoing conduct of providing chicken by-products (rather than chicken meal) to fulfill the contract brokered by Diversified on Blue Buffalo's behalf. While Diversified and Custom Ag argue the fortuity doctrine does not apply because Blue Buffalo's alleged false advertising—the basis of the consumer class and Purina lawsuits—did not begin until 2013 [Dkt. 34–1 at pg. 9], for the reasons already explained, the Court will not attribute Blue Buffalo's conduct to Custom Ag so as to allow coverage which is otherwise unavailable under the Policy. Moreover, the harm caused by Custom Ag began when its alleged conduct occurred: Blue Buffalo paid for superior quality chicken meal but received an inferior product instead and, in turn, consumers paid for high quality animal food they did not receive. Custom Ag's after-the-fact attempt to obtain insurance coverage for the alleged and

ongoing violation of its contractual responsibilities is barred by the fortuity doctrine.

### C. Policy Exclusions

■ Finally, the Policy language includes coverage exclusions applicable to this case. Specifically, Colony argues Custom Ag is not entitled to coverage under Coverage B, Exclusion 2(f)—the breach of contract exclusion—restated below [Dkt. 32 at 29].[4]

#### f. Breach Of Contract

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement."

[Dkt. 32-1 at 8]. Custom Ag's liability undeniably rests on its alleged failure to perform a contract in accordance with the express specifications demanded by Blue Buffalo and brokered by Diversified [Dkt. 41-1 at 3–4]. Under Exclusion 2(f) of Coverage B, personal and advertising injury "arising out of a breach of contract" is not covered [Dkt. 32-1 at 8]. Diversified's complaint against Custom Ag makes numerous factual allegations concerning the contract between the two and asserts repeatedly Custom Ag did not provide the products for which Diversified had contracted [*see* Dkt. 41 at 19–22 (citing relevant portions of Diversified's complaint)]. The Court finds that, even assuming the fortuity doctrine did not bar coverage, and that coverage was otherwise provided under the Policy, coverage would still be excluded under the breach of contract exclusion in paragraph 2(f).

### III. DUTY TO INDEMNIFY

■ While the duty to indemnify is generally evaluated only after liability is established in the underlying lawsuit, if the same reasons negating the duty to defend likewise negate "any possibility the insurer will ever have a duty to indemnify," the court may decide at the outset of a case that an insurer has no duty to indemnify. *LCS Corr. Servs., Inc.*, 800 F.3d at 669 (quoting *Griffin*, 955 S.W.2d at 84). Custom Ag is not alleged to have engaged in false arrest, detention or imprisonment; malicious prosecution; wrongful eviction; any slanderous, libelous or disparaging oral or written publications; any oral or written publication that violated someone's right of privacy; or the use of another's advertising idea, or the copyright, trade dress or slogan of another, in Custom Ag's advertisements. As such, Custom Ag's conduct did not cause personal and advertising injury covered under the terms of Coverage B [Dkt. 32-1 at 12]. And the alleged actions of Custom Ag violated the terms of its contact brokered by Diversified on behalf of Blue Buffalo, with that contract (as alleged) providing the sole source of any obligation owed by Custom Ag to Blue Buffalo. As such, the indemnification and contribution claims against Custom Ag sound in breach of contract. Having thoroughly reviewed the claims alleged in the Parties' pleadings and the terms of the Policy, the Court finds the same facts

---

4. Colony argues coverage is also excluded under Coverage B, Exclusions 2 (a), (c) and (d). While Colony may be correct, as to each of these exclusions, the Court cannot render a decision as a matter of law. That is, determining if Custom Ag "[knew] that the act would violate the rights of another and would inflict 'personal and advertising injury,' " (Exclusion 2(a)); and whether any personal and advertising injury arose "from a publication [made] before the beginning of the policy period," (Exclusion 2(c)); or "out of a criminal act committed by or at the direction of the insured," (Exclusion 2(d)); would raise issues of fact regarding Custom Ag's knowledge and intent, along with the date when Blue Buffalo's alleged false advertising first occurred. Exclusions (a), (c), and (d) of Coverage B are not suitable for summary judgment disposition on the record currently before the Court.

which negate any duty to defend also negate any possibility that Colony will have a duty to indemnify Custom Ag if Custom Ag is determined to be liable in Missouri litigation.

Accordingly, as to both the duty to defend and the duty to indemnify, Colony's motion for summary judgment should be granted.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Court recommends that Plaintiff Colony Insurance Company's Motion for Summary Judgment [Dkt. 32] be **GRANTED** and Defendant Diversified Ingredients, Inc.'s Cross Motion for Summary Judgment [Dkt. 34] and Defendant Custom Ag Commodities, LLC's Cross Motion for Summary Judgment [Dkt. 36] be **DENIED**.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).